Filed 7/8/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re ALEXANDRIA P., a Person Coming Under the Juvenile Court Law. | B270775 (Los Angeles County Super. Ct. No. CK58667) |

LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,

      Plaintiff and Respondent,

      v.

J.E.,

      Defendant and Respondent;

R.P., et al.,

      Objectors and Appellants;

Choctaw Tribe of Oklahoma,

      Intervenor and Respondent.

      APPEAL from a judgment of the Superior Court of Los Angeles County, Rudolph A. Diaz, Judge. Affirmed.

      Roberto Flores; Wilkinson Walsh + Eskovitz, Lori Alvino McGill, for Objectors and Appellants.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, Kim Nemoy, Principal Deputy County Counsel, for Plaintiff and Respondent.

Law Offices of Joanne Willis Newton, Joanne D. Willis Newton, under appointment by the Court of Appeal, for Defendant and Respondent.

Christopher Blake, under appointment by the Court of Appeal, for minor Alexandria P.

Melissa L. Middleton, for Intervenor and Respondent.

Munger, Tolles & Olson, James C. Rutten, Jordan D. Segall, Wesley T.L. Burrell, Varun Behl, for Advokids, Center for Adoption Policy and Professors Joan H. Hollinger, Elizabeth Bartholet, and Barbara Bennett Woodhouse, as Amici Curiae.

———————————————

## INTRODUCTION

For the third time this case comes before us on the issue of whether the lower court has correctly ordered an Indian child, Alexandria P., to be placed with her extended family, Ken R. and Ginger R. in Utah, after concluding that Alexandria's foster parents, de facto parents, Russell P. and Summer P., failed to prove by clear and convincing evidence that there was good cause to depart from the adoptive placement preferences set forth in the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.).[1]

We have twice remanded the matter because the lower court used an incorrect standard in assessing good cause. The dependency court has now correctly applied the law governing good cause, considering the bond Alexandria has developed over time with the P.s, as well as a number of other factors related to her best interests. Those other factors include Alexandria's relationship with her extended family and half-siblings; the capacity of her extended family to maintain and develop her sense of self-identity, including her cultural identity and connection to the Choctaw tribal culture; and the P.s' relative reluctance or resistance to foster Alexandria's relationship with her extended family or encourage exploration of and exposure to her Choctaw cultural identity.

Because substantial evidence supports the court's finding that the P.s did not prove by clear and convincing evidence that there was good cause to depart from the ICWA's placement preferences, we affirm.

## PROCEDURAL BACKGROUND

We briefly review the key procedural events that have brought this case up to the current appeal.

---

[1] All statutory references are to 25 U.S.C., unless otherwise indicated.

*Initial good cause hearing and decision (Judge Pellman)*

The following excerpt from our 2014 opinion (*In re Alexandria P.* (2014) 228 Cal.App.4th 1322 (*Alexandria I*)) summarizes the initial history of the case: "A 17-month-old Indian child was removed from the custody of her mother, who has a lengthy substance abuse problem and has lost custody of at least six other children, and her father, who has an extensive criminal history and has lost custody of one other child. The girl's father is an enrolled member of an Indian tribe, and the girl is considered an Indian child under the ICWA.[2] The tribe consented to the girl's placement with a non-Indian foster family to facilitate efforts to reunify the girl with her father. The girl lived in two foster homes before she was placed with de facto parents at the age of two. She bonded with the family and has thrived for the past two and a half years.

"After reunification efforts failed, the father, the tribe, and the Department of Children and Family Services (Department) recommended that the girl be placed in Utah with a non-Indian couple who are extended family of the father. The de facto parents (de facto parents) argued good cause existed to depart from the ICWA's adoptive placement preferences and it was in the girl's best interests to remain with de facto family. The child's court-appointed counsel argued that good cause did not exist. The court ordered the girl placed with the extended family in Utah after finding that de facto parents had not proven by clear and convincing evidence that it was a certainty the child would suffer emotional harm by the transfer." (*Alexandria I, supra,* 228 Cal.App.4th at pp. 1328-1329.) The de facto parents appealed, and this court issued a writ of supersedeas staying the court's order pending resolution of the appeal, with expedited briefing. (*In re A.P.* (Mar. 4, 2014, B252999) [order].)

---

[2] At the time of our 2014 opinion, Alexandria was eligible for enrollment as a member of the Choctaw Nation of Oklahoma. Since that time, she has become an enrolled member of the tribe.

*Court of Appeal opinion reversing and remanding*

In an opinion filed August 15, 2014, we reversed and remanded for the lower court to determine under the appropriate standard whether de facto parents could show good cause to depart from the placement preferences of the ICWA. (*Alexandria I, supra,* 228 Cal.App.4th 1322.) Our opinion acknowledged that over a year had passed since the earlier good cause hearing, and the court was free to consider facts and circumstances that arose since the filing of the first appeal. (*Id*. at p. 1357.) Remittitur issued on November 7, 2014.

*Additional good cause hearing and decision (Judge Trendacosta)*

On remand, the case was assigned to Judge Trendacosta, who held a hearing spanning five days in September 2015 to determine whether good cause existed to depart from the ICWA's placement preferences. The parties submitted written closing arguments on September 16, 2015, and Judge Trendacosta issued a November 3, 2015 statement of decision concluding that the de facto parents had not proven good cause by clear and convincing evidence.

*Peremptory writ and remand*

The P.s again sought a supersedeas writ staying Judge Trendacosta's order to transfer Alexandria to the R.s' home in Utah. On November 12, 2015, we issued an order notifying the parties we were considering treating the petition for writ of supersedeas as a petition for writ of mandate, and issuing a peremptory writ in the first instance vacating the court's November 3, 2015 order and directing the court to apply the correct burden of proof. We explained the lower court's error by pointing out that Judge Trendacosta's written decision "described the burden on the de facto parents in language that is identical, word-for-word, to the language we disapproved as an incorrect statement of law

5

in the prior appeal." (*In re Alexandria P.* (Nov. 12, 2015, B268111) [order].) Both Judge Pellman and Judge Trendacosta stated the de facto parents had not proven by clear and convincing evidence "that either the child currently had extreme psychological or emotional problems or would [definitively] have them in the future." In contrast, our *Alexandria I* opinion clarified that de facto parents needed to show "by clear and convincing evidence that there is a significant risk that a child will suffer serious harm as a result of a change in placement." (*Alexandria I, supra*, 228 Cal.App.4th at p. 1354.)

After considering letter briefs filed by the parties, we directed the dependency court to vacate its November 3, 2015 order, and enter a new placement order based on application of the burden of proof set forth in *Alexandria I, supra*, 228 Cal.App.4th at page 1354. We considered the nature of the error, the already lengthy dependency in this case, and the need for a prompt and permanent resolution of the issue of placement. We also emphasized that time was of the essence, directing the Presiding Judge of the Juvenile Court of Los Angeles County to ensure a judicial officer was promptly assigned to the case, and directing the lower court to resolve the issue of placement within 30 days of issuance of a remittitur, absent extraordinary circumstances. We stated that we were expressing no opinion on how the issue of placement should be resolved. (*R.P. v. Superior Court* (Nov. 25, 2015, B268111) [nonpub. opn.].) On January 29, 2016, we dismissed as moot the appeal of Judge Trendacosta's November 3, 2015 order, returning jurisdiction to the lower court.

*Third good cause decision (Judge Diaz)*

The case was ultimately assigned to Judge Diaz, who rendered a decision from the bench on March 8, 2016. Judge Diaz concluded the de facto parents had not shown good cause to depart from the ICWA's placement preferences, and he ordered Alexandria removed from the custody of the P.s and placed with the R.s in accordance with the ICWA.

6

*Current Appeal*

The P.s appealed on March 9, 2016, and petitioned for a writ of supersedeas the following day. This court granted a temporary stay on March 11, 2016, and on March 18, 2016, we denied the petition for writ of supersedeas. In early April, we granted calendar preference and set an expedited briefing schedule, with oral arguments taking place on June 10, 2016.[3]

## FACTUAL BACKGROUND[4]

A.   **Facts preceding first good cause hearing**

In order to give adequate background information, we repeat an excerpt from our 2014 opinion summarizing the case history up to Judge Pellman's decision:

"*Alexandria's Child Welfare History*

"Alexandria was detained from her parents and placed with a foster family when she was 17 months old, based on concerns about her parents' ability to care for her in

---

[3] Due to the expedited schedule, the parties and this court have relied upon the exhibits filed in connection with the writ proceedings following Judge Trendacosta's decision (B268111, seven volumes of exhibits filed by minor), and the writ proceedings following Judge Diaz's decision (B270775, four volumes of exhibits filed by the P.s, plus one volume of expedited reporter's transcripts). None of the parties have raised an objection to the adequacy of the record for appellate review.

[4] When the parties present either contradictory evidence or evidence from which different inferences may be drawn, the substantial evidence standard of review requires the reviewing court to resolve all contradictions and draw all inferences in favor of the judgment or order being appealed. (*Fresno County Dept. of Children & Family Services v. Superior Court* (2004) 122 Cal.App.4th 626, 642-643 (*Fresno County*).)

7

light of their histories of substance abuse, child welfare referrals, and criminal activity. Alexandria reportedly was moved to a different foster family after suffering a black eye and a scrape on the side of her face.[5] The P.s were Alexandria's third foster care placement, initially arranged in December 2011 as a 'respite care' placement[6] that evolved into a long-term foster care placement. The P.s were aware that Alexandria was an Indian child and her placement was subject to the ICWA.

"By the time Alexandria was placed with the P.s in December 2011, her extended family in Utah, the R.s, were aware of dependency proceeding and had spoken to representatives of the tribe about their interest in adopting Alexandria. The tribe agreed to initial foster placement with the P.s because it was close to father as he worked on reunification. If reunification services were terminated, the tribe recommended placement with the R.s in Utah.

"*Alexandria's Emotional Health*

"Alexandria's first months after being placed with the P.s were difficult. She was weepy at times, did not want to be held, and had difficulty differentiating between strangers and caregivers, indiscriminately calling people 'mommy' or 'daddy.' These behaviors were considered signs of a 'reactive attachment, the disinhibitive type.' The P.s addressed Alexandria's attachment issues with consistency and loving care. They did not ask the social worker for a therapy referral, understanding the issues to be ones they could work out on their own. After a few months, Alexandria's behavioral issues

---

[5] "Lauren Axline, a rebuttal witness called by the P.s, was the only witness who testified about the transfer from Alexandria's first foster family to her second placement. Department reports indicate that Alexandria's foster placement changed twice between April and December 2011, but do not provide any reason for the changes in placement."

[6] "The P.s agreed to care for Alexandria while her second foster family went on vacation."

resolved, and she formed a strong primary bond and attachment with the entire P. family, viewing the parents as her own parents and the P. children as her siblings.

"On September 17, 2012, Alexandria began play therapy with Ruth Polcino, a therapist with United American Indian Involvement. Sessions took place weekly in the P. home. In a December 31, 2012 letter to the Department's social worker Javier, Polcino noted Alexandria's 'happiness, playfulness, sense of safety, and positive rapport with her foster parents and siblings' and concluded that her consistent, loving experience in the foster home appears to have fostered a healthy and secure attachment. Notably, the letter concludes 'Based on witnessing Alexandria in the [P.s'] household, and based on her history of repeated separation from caretakers, this therapist highly recommends that Alexandria be allowed to stay in touch with the [P.] family, even after she is placed with her Aunt [Ginger R.] in Utah. This recommendation is not intended to interfere with the current adoption, but rather to allow Alexandria to stay in touch with the [P.] family as extended family who care about her.'

"An April 3, 2013 report notes the significant advancements made by Alexandria during her placement with the P.s, as well as her ability to form a healthy attachment to new caretakers: 'Alexandria's ability to re-attach to a new caretaker is stronger because of the stability that the [P.] family has provided for her. The behaviors that she presented with initially when placed with the [P.] family were much more indicative of a possible attachment disorder (i.e., the indiscriminate attachment she demonstrated with strangers). Since then, these behaviors have been almost entirely extinguished. In their place are more appropriate behaviors that are evidence of a more healthy and secure attachment . . . .'

"*Father's Reunification Efforts*

"Alexandria's father successfully complied with reunification services for more than six months, progressing to such an extent that he was granted unmonitored eight-hour visits. By June 2012, the Department reported a substantial probability he would

9

reunify with Alexandria within the next six months.  Shortly thereafter, however, father's emotional state deteriorated dramatically.  He separated from his new wife, left California, and did not visit Alexandria after July 28, 2012.  By September 2012, he had communicated to the Department that he no longer wished to continue reunification services.

"*The R. Family*

"Because Ginger R.'s uncle is Alexandria's paternal step-grandfather, the tribe recognizes the R.s as Alexandria's extended family.  The R.s have an ongoing relationship with Alexandria's half-sister, Anna, who visits the R.s on holidays and for a week or two during the summer.  Anna and Alexandria have the same paternal grandmother (who has since passed away) and step-grandfather, and the step-grandfather has designated the R.s to care for Anna if he should become unable to care for Anna.

"The R.s expressed their interest in adopting Alexandria as early as October 2011. They were initially told that to avoid confusing Alexandria, they should not contact her while father attempted to reunify.  If reunification efforts failed, they were the tribe's first choice for adoption.  The family has approval for Alexandria to be placed with them under the Interstate Compact on the Placement of Children (ICPC, Fam. Code, § 7900 et seq.).  The R.s first visited Alexandria shortly after the court terminated father's reunification services.  Since then, they video chat with Alexandria about twice a week and have had multiple in-person visits in Los Angeles.  The P.s refer to the R.s as family from Utah.  At one point, when Alexandria asked if she was going to Utah, the P.s responded that they did not know for sure, but it was possible.  Russell and Summer P. testified that before and following a recent visit by the R.s, most likely in June 2013, Alexandria was upset and said she did not want to visit with the R.s and did not like it when they came to visit.  Russell P. acknowledged that the change in Alexandria's feelings coincided with the birth of a new baby in the P. family and a transition to a new therapist for Alexandria.

"*The P. Family*

"Alexandria has lived with the P.s for over two and a half years, beginning in December 2011.  By all accounts, they have provided her with clear and consistent rules, and a loving environment.  Alexandria is bonded to the P.s, and has a healthy attachment to them.  The Department consistently reminded the P.s that Alexandria is an Indian child subject to the ICWA placement preferences.  At some point after father's reunification efforts failed, the P.s decided they wanted to adopt Alexandria.  They discussed the issue with the Department social worker, who advised them that the tribe had selected the R.s as the planned adoptive placement.

"*Transition Planning*

"As ordered by the court on April 12, 2013, the Department arranged a conference call to discuss a transition plan in anticipation of a possible court order directing placement with the R.s.  The call lasted 90 minutes and included the P.s in Los Angeles; the R.s from Utah; Ruth Polcino, Alexandria's therapist at United American Indian Involvement; Polcino's supervisor, Jennifer Lingenfelter; Alexandria's attorney, Kerri Anderson; Department social worker Roberta Javier, as well as two other Department employees.  The participants agreed on a transition plan that involved a relatively short transition, with both families meeting for breakfast or at a park, explaining to Alexandria that she is going to live with the R.s, who are family who love Alexandria very much and will take good care of her.  The P.s would reassure Alexandria that they love her and will always be a part of her family." (*Alexandria I, supra*, 228 Cal.App.4th at pp. 1330-1333.)

11

After the good cause hearing, Judge Pellman issued a written order concluding that the P.s had not demonstrated good cause to depart from the ICWA's placement preferences. The P.s. appealed, and on August 15, 2014, we published a decision reversing and remanding the matter for a new good cause hearing. (*Alexandria I*, *supra*, 228 Cal.App.4th 1322.)

## B.     Facts preceding second good cause hearing

While the P.s' first appeal of Judge Pellman's decision was pending, several disputes arose between the parties. In March 2014, the P.s insisted that they must be present for Alexandria's visits with the R.s, despite the Department clarifying that unmonitored visits were permitted. After the P.s unsuccessfully sought Court of Appeal intervention to prevent the R.s from taking Alexandria to Disneyland, Judge Pellman ordered that Alexandria's monthly visits with the R.s would remain unmonitored and would be in accordance with her schedule (around things like naptime).[7] The R.s had a four-hour visit with Alexandria at Disneyland, but after Alexandria was delayed in returning home because the social worker was stuck in traffic, the P.s refused to allow another visit the following day. In July 2014, Alexandria's therapist, Stephanie Wejbe, sought to transition Alexandria's play therapy with the P. family to individual sessions outside of the home. The therapist noted that she had been expressing concern in her written reports since October 2013 about distractions interfering with Alexandria's therapy and gave examples of Summer P. limiting or interfering with therapy. When the Department brought the matter to the court's attention, the P.s opposed any changes, arguing that the court had never ordered individual therapy for Alexandria, and sessions outside the home would cause her anxiety. Judge Pellman set the matter for a subsequent

_____

[7] Pursuant to Evidence Code sections 452, subdivision (d)(1), and 459, subdivision (a), we take judicial notice of minute orders dated March 19, 2014, and March 20, 2014.

hearing.  Also in July 2014, the P.s, through their foster family agency, filed a report alleging Ginger R. had driven off at the beginning of a visit when Alexandria did not yet have her seat belt on.  The Department did not take any action, and its reports indicate the visit went well.

After remand, the case was assigned to Judge Trendacosta, who ordered individual therapy for Alexandria in December 2014.[8]  Alexandria seemed happier and less anxious in individual sessions and was much more open about discussing family.  Wejbe felt that Summer P. was reluctant to implement some of the therapy tools she suggested for Alexandria in the home, and the P. family did not attend many of the cultural activities offered through United American Indian Involvement.  During one session, Wejbe made a dreamcatcher with Alexandria.  Summer P. testified the dreamcatcher had ended up in the trash.

Alexandria had consistent monthly visits with the R.s, and video calls with them about twice a week.  The video call sessions were sometimes challenging because Alexandria would get distracted.  Her in-person visits with the R.s were generally comfortable and relaxed, and Alexandria would sometimes ask to spend additional time with the R.s.  In contrast to Alexandria's demeanor during visits with the R.s, the P.s reported Alexandria would display anxious behaviors upon returning from visits, being clingy and sometimes crying.

The R.s would usually include Alexandria's older half-sister, Anna, in the visits.  Alexandria first met Anna during a July 2013 visit, when Anna was about 12 years old.  Anna lived with the R.s for a time, but by September 2015, she had moved down the street from the R.s.  Alexandria's younger half-sister Kayla was born in March 2015, and was being cared for by R.s.  Alexandria responded to Kayla positively during

_____

        [8] The P.s assert in their brief that at the first in-chambers conference, they sought Judge Trendacosta's permission to obtain a bonding study and asked the judge to promptly set a date for a new good cause hearing, but their requests were ignored.  The P.s do not support these assertions with any evidence in the record, beyond their own counsel's assertion in a later hearing.  An unsworn statement of counsel is not evidence. (*In re Zeth S.* (2003) 31 Cal.4th 396, 414, fn. 11.)

13

Alexandria's first overnight visit with the R.s in April 2015. On a visit to Utah, Alexandria left Post-its around the house, including one on Kayla's swing, because she did not want her sister to forget her.

Ginger R. had a close relationship with Alexandria's paternal grandmother, Sharon L., who was married to Ginger's uncle. Sharon was Choctaw, with a close connection to her tribe, and considered Ginger like a daughter, sharing stories with her. Ginger also grew up in a community with many ties to Native American culture. Ginger has been in contact with the Choctaw tribe since Sharon's death in August 2011, and communicates with the tribe at least monthly, but often weekly.

The P.s have described efforts they made to incorporate Native American culture into their lives. Summer P. has Southern Tuscarora heritage, but the tribe is not enrolling new members and is not a federally recognized tribe. They have painted one wall of their kitchen "Navajo Blue," and are members of the Autry Museum, participating in Native American arts and crafts activities. They attend an annual pow-wow, and shortly before the September 2015 good cause hearing, Summer and Alexandria attending a sage burning ceremony. However, Summer declined to participate in a part of the activity, and did not encourage Alexandria to participate.

Alexandria began overnight weekend visits with the R.s in April 2015, staying with them from Friday to Sunday in southern California. In July 2015, she had a weeklong visit in Utah with the R.s. A social worker traveled with her, observed her transition to the R.s, and reported that Alexandria was excited about the visit and appeared to be comfortable in the R. home. On the return trip, Alexandria told the social worker she had a great time and would like to visit her sister and the R.s again. The P.s felt that Alexandria was too young for overnight visits, noting that they would not let their son of the same age stay with someone overnight.

14

On March 26, 2015, the court appointed Linda Doi Fick to conduct an evaluation under Evidence Code 730.[9] All parties agreed to Doi Fick as a neutral evaluator. She spent over 25 hours on interviews, observations, and consultations, plus another 20 hours reviewing case records in order to write her report, so she was familiar with the history of the case and Alexandria's relationship with the P.s. During Doi Fick's time observing Alexandria and her interactions with the P.s and the R.s, Alexandria had three separate overnight visits with the R.s, and Doi Fick met with Alexandria and/or the R.s during or at the end of each visit. She was also able to observe in her office how Alexandria was able to transition from a visit with the R.s back to the P.s, and spoke by phone with the P.s about their concerns with Alexandria's behavior and demeanor after visits with the R.s. Doi Fick commented that Alexandria appeared to have a good rapport with minor's counsel Jennifer McCartney, who during one visit informed Alexandria of changes to the schedule, which Alexandria easily accepted.

After Doi Fick's report was completed on June 25, 2015, the P.s asked the court to approve an independent evaluator for a bonding study, emphasizing it was necessary for the good cause hearing. Minor's counsel opposed the request. At a hearing on July 8, 2015, the court explained that Doi Fick, in her capacity as an Evidence Code section 730 expert who was well-known to the court, was acting as an independent evaluator, but the court would permit the P.s to retain an expert to review Doi Fick's report. The P.s retained Deena McMahon, whose initial report included observations and conclusions based not only on her review of Doi Fick's report and information provided to her by the P.s, but also observations of and interviews with the P. family and Alexandria. McMahon's report was faxed to the parties on August 17, 2015. On August 20, 2015,

[9] Doi Fick is a licensed marriage and family therapist with a master's degree in human development. She has been a member of the court's 730 Expert Panel since 1991. Evidence Code section 730 states, in relevant part: "When it appears to the court, at any time before or during the trial of an action, that expert evidence is or may be required by the court or by any party to the action, the court on its own motion or on motion of any party may appoint one or more experts to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required."

15

minor's counsel filed a motion in limine to exclude the report and sought sanctions on the grounds that the court had not authorized and the P.s' attorney never obtained permission for McMahon to speak with Alexandria. On the first day of the scheduled good cause hearing, the court heard argument on minor's motion to exclude the McMahon report, and decided it would strike the report, but permit the P.s to proffer the expert on the limited basis of her review of Doi Fick's report only.

The court's good cause hearing commenced on September 1, 2015, and continued over five separate days. During the hearing, the P.s presented testimony from the following witnesses: (1) Russell P.; (2) Summer P.; (3) McMahon, a bonding and attachment expert; (4) Dr. Michael Ward, a member of the court's Evidence Code section 730 panel; and (5) Lauren Axline, a social worker from their foster family agency. Minor's counsel called the following witnesses: (1) Doi Fick, the expert appointed by the court under Evidence Code section 730; (2) Ginger R.; (3) minor's therapist Wejbe; and (4) Dr. Carrie Johnson, a licensed clinical psychologist who is a director of Seven Generations at United American Indian Involvement and an expert on cultural identity. The Choctaw tribe called tribal social worker Amanda Robinson. Counsel for the Department and father participated in argument and cross-examined witnesses, but did not call any witnesses. The Department offered into evidence reports from January 31, 2013 through August 17, 2015, and asked the court to take judicial notice of all prior findings and orders. The only documents received into evidence from the P.s that are part of our record on appeal are (1) a second report by McMahon,[10] which does not include any information or conclusions gleaned from her observations of or interactions with Alexandria, and (2) a packet of e-mail correspondence involving the P.s' possible Indian heritage and their efforts to arrange visits with Alexandria's half-sister Anna.

As explained in the procedural background section of this opinion, Judge Trendacosta issued a ruling on November 3, 2015 deciding that the P.s had not proven good cause to depart from the ICWA's placement preferences, and ordering that

_____

[10] McMahon's original report is included as an exhibit on appeal, but it was not admitted into evidence by the trial court.

16

Alexandria be placed with the R.s. The ruling was then stayed by peremptory writ, and the matter remanded on January 29, 2016.

## C.     Facts preceding third good cause hearing

The case was assigned to Judge Diaz on February 2, 2016. On February 5, 2016, Judge Diaz requested all counsel to verify that he had the complete record to review before making a decision. The P.s filed a request to present additional evidence on February 19, 2015. The court deferred ruling on the request because it had not yet reviewed the entire file, but emphasized that it was hesitant to permit testimony because it would cause a delay, and the appellate court had not given any specific direction about reopening the case for further testimony.

On February 26, 2016, the P.s asked the court to either permit them to cross-examine the Department's social worker Orisco Wilson, or in the alternative, for the court to decline to review the reports submitted by the Department. The court deferred ruling on the request. When minor's counsel pointed out that the 30-day deadline set by this court was only three days away, Judge Diaz found that additional time was necessary to review all the evidence.

On March 8, 2016, the court began by explaining that it would not be appropriate to take additional evidence, given that it was not directed by the appellate court, and would cause more delay. The parties argued their positions and the court issued its ruling from the bench without an accompanying written decision. It found the P.s had not met their burden of proving by clear and convincing evidence that there was a significant risk of serious harm as a result of a change in placement. The court acknowledged Alexandria was bonded to the P.s, and noted that it would be an "easy call" if Alexandria was going to be "removed from a family who has the strength of the bond and place[d] into a family that is significantly unknown . . . ." In contrast, Alexandria had bonded with the R.s and she had an opportunity to bond with and grow up with her half-siblings as well. The court also found it was in Alexandria's best interests to provide her with the

opportunity to be raised in the Indian culture, even though she would not be living on a reservation. The court ordered Alexandria to be placed with the R.s and imposed a seven-day stay, after which Alexandria would be moved without a transition plan.

The P.s filed a notice of appeal, and also sought another writ of supersedeas to stay Alexandria's transfer. We denied the writ petition on March 18, 2016.[11]

## DISCUSSION

The key question on appeal is whether the dependency court's decision to place Alexandria with the R. family in Utah in accordance with the ICWA's placement preferences is supported by substantial evidence. The P.s raise a number of collateral issues as well. After reviewing the law governing good cause determinations, we address the following issues: (a) law of the case and the scope of remand; (b) good cause as a matter of law; (c) the substantial evidence supporting the court's finding of no good cause; and (d) the court's evidentiary rulings.

## A.     The ICWA placement preferences and good cause exception

The oft-discussed history and overall requirements and presumptions of the ICWA are discussed in *Alexandria I*, *supra*, 228 Cal.App.4th at pages 1337 through 1340. Most relevant to the current discussion is the good cause exception to the ICWA's placement preferences. The ICWA provides that when an Indian child is put into an adoptive placement, "a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." (§ 1915(a).) California law parallels

---

[11] The parties have attempted to call the court's attention to a number of facts that occurred after the Notice of Appeal was filed, most of which relate to Alexandria's transfer to the R.s. We find the post-appeal facts to be irrelevant to our review, and therefore decline to consider them.

these federal requirements, and also clarifies that the party requesting departure from the ICWA's placement preferences bears the burden of establishing the existence of good cause. (Welf. & Inst. Code, § 361.31, subd. (j); see also *In re Anthony T.* (2012) 208 Cal.App.4th 1019, 1029.)

Our earlier opinion referenced guidelines enacted by the Department of the Interior, Bureau of Indian Affairs (Bureau) in 1979, which provided nonbinding guidance on implementation of the ICWA. (44 Fed.Reg. 67584 (Nov. 26, 1979); *Alexandria I*, *supra*, 228 Cal.App.4th at p. 1339.) In 2015, the Bureau issued an updated set of *Guidelines for State Courts and Agencies in Indian Child Custody Proceedings* (80 Fed.Reg. 10146 (Feb. 25, 2015) (*Guidelines*)) to replace the 1979 guidelines. The *Guidelines* are instructive or advisory, not mandatory. (*Fresno County Dept. of Children & Family Services v. Superior Court* (2004) 122 Cal.App.4th 626, 642-643 (*Fresno County*).) The Bureau also subsequently issued a final rule[12] to govern the ICWA implementation. (81 Fed.Reg. 38778 et seq. (June 14, 2016).) The rule does not directly affect the current proceeding because it does not take effect until December 12, 2016.[13] We mention the new rule here, however, because the continued relevance and viability of the 2015 *Guidelines* once the rule takes effect is not entirely clear. The language and substance of the rule differ from the 2015 *Guidelines* in ways that we will discuss in

---

[12] The regulations contained in the rule will appear in Title 25 of Code of Federal Regulations as "Subpart I-Indian Child Welfare Act Proceedings." Section 23.101 states "The regulations in this subpart clarify the minimum Federal standards governing implementation of the Indian Child Welfare Act (ICWA) to ensure that ICWA is applied in all States consistent with the Act's express language, Congress's intent in enacting the statute, and to promote the stability and security of Indian tribes and families." (81 Fed.Reg., *supra*, at p. 38868.)

[13] Section 23.143 of the rule states, "None of the provisions of this subpart affects a proceeding under State law for foster-care placement, termination of parental rights, preadoptive placement, or adoptive placement that was initiated prior to December 12, 2016, but the provisions of this subpart apply to any subsequent proceeding in the same matter or subsequent proceedings affecting the custody or placement of the same child." (81 Fed.Reg., *supra*, at p. 38876.)

detail later in this opinion, but nothing in the rule states that it supersedes the *Guidelines*. Instead, the new rule states, "In some cases, the [Bureau] determined that particular standards or practices are better suited to guidelines; the [Bureau] anticipates issuing updated guidelines prior to the effective date of this rule (180 days from issuance)." (81 Fed.Reg., *supra*, at p. 38780.) Updated guidelines have not yet been issued, but the new rule does contain provisions that will be relevant to good cause determinations in future cases.

The portion of the 2015 *Guidelines* outlining what courts should consider in determining good cause cautions against giving weight to ordinary bonding that may occur in a placement that does not comply with the ICWA.[14] (*Guidelines*, 80 Fed.Reg., *supra*, at p. 10158.) The new final rule provides that "[a] placement may not depart from the preferences based solely on ordinary bonding or attachment that flowed from time spent in a non-preferred placement that was made in violation of ICWA." (81 Fed.Reg., *supra*, at p. 38875; 25 C.F.R. § 132(e), effective Dec. 12, 2016.) The Bureau explains the distinction between the *Guidelines*'s reference to a "placement that does not comply with ICWA" and the rule's reference to a "placement that was made in violation of ICWA" as follows: "The comments reflected some confusion regarding what constitutes a 'placement that does not comply with ICWA.' For clarity, the final rule instead references a 'violation' of ICWA to emphasize that there needs to be a failure to comply with specific statutory or regulatory mandates. The determination of whether there was a violation of ICWA will be fact specific and tied to the requirements of the statute and this rule. For example, failure to provide the required notice to the Indian child's Tribe for a year, despite the Tribe having been clearly identified at the start of the proceeding, would be a violation of ICWA. By comparison, placing a child in a non-preferred placement

---

[14] *Guidelines* Part IV, section F.4, subdivision (c)(3) provides that a finding of good cause could be based on the extraordinary physical or emotional needs of the child, but that "extraordinary physical or emotional needs of the child does not include ordinary bonding or attachment that may have occurred as a result of a placement or the fact that the child has, for an extended amount of time, been in another placement that does not comply with the Act." (*Guidelines*, 80 Fed.Reg., *supra*, at p. 10158.)

would not be a violation of ICWA if the State agency and court followed the statute and applicable rules in making the placement, including by properly determining that there was good cause to deviate from the placement preferences." (81 Fed.Reg., *supra*, at p. 38846.)

On the role a child's best interests play in a good cause determination, the 2015 *Guidelines* state "[t]he good cause determination does not include an independent consideration of the best interest of the Indian child because the preferences reflect the best interests of an Indian child in light of the purposes of the Act." (*Guidelines*, 80 Fed.Reg., *supra*, at p. 10158.) In contrast, the new regulations that the final rule will add to the Code of Federal Regulations do not contain any reference to a child's best interests in the context of determining whether good cause exists to depart from the ICWA's placement preferences. When the Notice of Proposed Rulemaking that led to the final rule was available for public comment, commenters either approved of the omission of any reference to best interests, or objected to the omission. (See 81 Fed.Reg., *supra*, at p. 38847.) The Bureau's response to the comments emphasizes the risk present if courts were to use a best interests analysis as a less rigorous proxy for determining good cause in accordance with the final rule: "ICWA and this rule provide objective mandates that are designed to promote the welfare and short- and long-term interests of Indian children. Congress enacted ICWA to protect the best interests of Indian children. However, the regulations also provide flexibility for courts to appropriately consider the particular circumstances of the individual children and to protect those children. For example, courts do not need to follow ICWA's placement preferences if there is 'good cause' to deviate from those preferences. The 'good cause' determination should not, however, simply devolve into a free-ranging 'best interests' determination. Congress was skeptical of using 'vague standards like "the best interests of the child,"' H.R. Rep. No. 95-1386[, 2d Sess., p. 19 (1978)], and intended good cause to be a limited exception, rather than a broad category that could swallow the rule." (81 Fed.Reg., *supra*, at p. 38847.)

Although our decision is not subject to or controlled by these provisions of the new final rule, the Bureau's issuance of the rule makes us even more reticent to rely on

the non-binding 2015 *Guidelines* as persuasive authority. The final rule clarifies the Bureau's intent in including the "ordinary bonding or attachment" statement in Part IV, section F.4 of the 2015 *Guidelines*, and no party contends that Alexandria's initial placement with the P.s was a "placement in violation of ICWA" (81 Fed.Reg., *supra*, at p. 38875)—and for good reason. The Choctaw tribe consented to the placement to facilitate efforts to reunify Alexandria with her father, and the P.s were informed that Alexandria was an Indian child subject to adoptive placement in accordance with the placement preferences.

We do observe, however, that our earlier opinion (and our analysis here) is fully consistent with the final rule's observation that a good cause determination should not devolve into a standardless, free-ranging best interests inquiry. We held that a child's best interest was a relevant factor in determining good cause, but recognized that it was one factor among several that a court would take into account in determining good cause. (*Alexandria I, supra*, 228 Cal.App.4th at pp. 1355-1356.) Our citations to cases from other states made this point clear. (*Native Village of Tununak v. State, Dept. of Health & Social Services, Office of Children's Services* (Alaska 2013) 303 P.3d 431, 451-452 [good cause depends on many factors, including the child's best interests]; *In Interest of A.E.* (Iowa 1997) 572 N.W.2d 579, 585 [good cause depends on a fact determinative analysis consisting of many factors, including the best interests of the child]; *In re Interest of Bird Head* (1983) 213 Neb. 741, 750 [331 N.W.2d 785, 791] ["[The ICWA] does not change the cardinal rule that the best interests of the child are paramount, although it may alter its focus"].) Nothing in our opinion directed the lower court to give greater weight to any one factor over others. A court tasked with determining good cause will consider a constellation of factors in determining whether a party has proven good cause by clear and convincing evidence. Among those factors will be the Indian child's best interests and whether the child is at significant risk of suffering serious harm as a result of a change in placement, including the effect of breaking a child's existing attachments. (*Alexandria I*, *supra*, 228 Cal.App.4th at pp. 1352-1356.)

22

**B.** **The court's decision did not exceed the scope of remand or disregard the law of the case.**

We reject the P.s' contentions that the lower court exceeded the scope of the remand stated in our August 15, 2014 opinion, or that it violated the law of the case established by that opinion. The opinion concluded that Judge Pellman's 2013 decision had applied an incorrect standard for determining whether the P.s had demonstrated good cause to depart from the ICWA's placement preferences. Recognizing that circumstances might have changed in the one-year interim between Judge Pellman's ruling and our decision to reverse and remand, we emphasized "that in determining whether good cause exists to depart from the placement preferences identified in section 1915(a), the court may consider facts and circumstances that have arisen since the filing of this appeal. (See, e.g., *In re B.C.* (2011) 192 Cal.App.4th 129, 150-151 [reversing and remanding with clarification that in determining child's best interests, the court may consider events arising since the filing of the appeal].)" (*Alexandria I*, *supra*, 228 Cal.App.4th at p. 1357.) The dependency court could consider the evidence that had already been presented, plus any new evidence it deemed relevant to the good cause determination, and decide whether the P.s had proven by clear and convincing evidence that there was good cause to depart from the ICWA's placement preferences, based partly on whether there was "a significant risk that [Alexandria] will suffer serious harm as a result of a change in placement." (*Id.* at p. 1354.) We noted that "the bond between Alexandria and her caretakers and the trauma that Alexandria may suffer if that bond is broken are essential components of what the court should consider when determining whether good cause exists to depart from the ICWA's placement preferences." (*Id*. at p. 1355.) We also concluded Judge Pellman should have given appropriate consideration to facts relevant to Alexandria's best interests. (*Id*. at pp. 1355-1356.)[15]

---

[15] Because the *Guidelines* are not binding (and of dubious vitality following the final rule in any event), we decline to consider whether our prior holding is affected by the issuance of those *Guidelines*.

Consistent with our earlier holding, the P.s could discharge their burden to show, by clear and convincing evidence, good cause to depart from the ICWA's placement preferences by demonstrating there was a significant risk that Alexandria would suffer serious harm as a result of a change in placement. (*Alexandria I*, *supra*, 228 Cal.App.4th at p. 1354, fn. omitted.)

The P.s complain that Judge Diaz's decision does not comply with this court's 2014 opinion because he did not make an individualized determination of Alexandria's best interests. They also argue the dependency court impermissibly expanded the scope of its inquiry—thereby exceeding the scope of this court's remand—by considering the impact on Alexandria's cultural identity if she were to remain with the P.s. Implicit in their claims is an argument that when conducting a best interests inquiry in the context of deciding whether good cause exists to depart from the ICWA's placement preferences, a court should not weigh considerations like cultural identity or connection to extended family, because those considerations are already incorporated into the presumption that placement in accordance with the ICWA is in an Indian child's best interests. We disagree.

The court's inquiries into substantial risk of serious harm and best interests are intertwined, fact-specific, and not susceptible to strict boundaries. When the best interests of an Indian child are being considered, the importance of preserving the child's familial and cultural connections often cannot be separated from other factors. The 2015 *Guidelines* cautioned against courts conducting "an *independent* consideration of the best interest of the Indian child because the preferences reflect the best interests of an Indian child in light of the purposes of the Act." (*Guidelines*, 80 Fed.Reg., *supra*, at p. 10158, italics added.) The regulations added by the recently issued final rule, which are intended to be binding on future state court determinations of good cause, are silent on what role a child's best interests will play in such a determination. While we reaffirm our earlier holding that a court should take an Indian child's best interests into account as one of the constellation of factors relevant to a good cause determination, we reject the P.s' argument that the best interests inquiry should exclude consideration of her connection to

24

extended family or her cultural identity. We also caution against using the best interests concept as carte blanche to seize upon any showing as sufficient reason to depart from the ICWA's placement preferences.

Judge Trendacosta and Judge Diaz considered Alexandria's best interests as part of their good cause determinations. Judge Diaz reviewed all of the testimony and evidence presented to Judge Trendacosta, and his ruling from the bench reflected his familiarity with the relevant facts. By considering details specific to Alexandria's circumstances, he conducted a best interests analysis. In the absence of any evidence that either Judge Trendacosta or Judge Diaz intentionally disregarded this court's directions on remand, we hold the court's March 8, 2016 decision complies with both the law of the case and our directions on remand.

## C.      Good cause does not exist as a matter of law.

We reject any argument that the facts before the court constituted good cause as a matter of law. The P.s frame the issue as compelling a particular result because Alexandria has been a part of their family for over four years. In their view, because Alexandria had a strong primary bond to the family—which all parties and the court concede she did—she would inevitably suffer trauma if that bond was broken, and so good cause exists as a matter of law. They support their argument by citing to cases and a statute where a minor's interest in stability and permanency prevailed over a biological parent's interests. (See, e.g., Fam. Code, § 3041, subd. (c); *In re Jasmon O.* (1994) 8 Cal.4th 398, 419 [recognizing child's right to stability and permanence based on risk of serious harm from severing bond to de facto parents]; *In re Marilyn H.* (1993) 5 Cal.4th 295, 306; *Guardianship of Zachary H.* (1999) 73 Cal.App.4th 51, 64.)

This argument ignores the multifaceted analysis that precludes reducing a good cause determination to a single question. The longevity of a child's foster placement may sometimes be relevant to deciding whether good cause exists to depart from the ICWA's placement preferences, but it cannot be the sole deciding factor. (See, e.g., *Matter of*

25

*Adoption of Halloway* (Utah 1986) 732 P.2d 962, 971-972 [acknowledging that placement stability is a paramount value, but it is not "the sole yardstick" for judging the validity of a child's placement].)  The United States Supreme Court has cautioned that courts should not "'reward those who obtain custody, whether lawfully or otherwise, and maintain it during any ensuing (and protracted) litigation,' [Citation.]"  (*Mississippi Band of Choctaw Indians v. Holyfield* (1989) 490 U.S. 30, 54.)  In addition, making the longevity of Alexandria's placement with the P.s a determinative factor would ignore not just the overall policy behind the ICWA, but also the more general state policy favoring preservation of extended family and sibling relationships in the dependency context.[16]

A holding that the facts before us constituted good cause as a matter of law would circumvent the policies favoring relatives and siblings, and it would incentivize families who knowingly accept temporary foster placements to delay an Indian child's ultimate adoptive placement in the hope that as time passes, the family will reach a "safe zone" where harm to a child from disrupting his or her primary attachment is presumed as a matter of law.  It is unwise and unnecessary to stretch the bounds of California law in that manner.

We also reject the P.s' contention that the federal Adoption and Safe Families Act of 1997 (the Act) (Pub.L. No. 105-89 (Nov. 19, 1997) 111 Stat. 2115) requires a finding of good cause as a matter of law.  The Act encourages child welfare agencies to engage in concurrent planning, meaning that while reunification services for parents are proceeding, the agencies concurrently identify and approve qualified families for adoptive placement

---

[16] For example, California's dependency statutes require social workers to investigate and locate relatives who may be potential caretakers for children who are removed from their parents, and requires courts to consider relative placement as an option.  (Welf. & Inst. Code, §§ 309, 319.)  Other statutes underscore the importance of ensuring that siblings are placed together in foster care, unless such arrangements are contrary to a minor's safety or well-being.  (Welf. & Inst. Code, §§ 361.2, subd. (f)(3), 361.3, subd. (a)(4), 16002, subd. (a)(1).)  In addition, the Bureau's new regulations include "the presence of a sibling relationship that can be maintained only through a particular placement" as a consideration upon which a determination of good cause can be based.  (81 Fed.Reg., *supra*, at p. 38874; 25 C.F.R. § 23.132(c)(3).)

26

if reunification efforts fail. Here, the Department and the tribe identified and approved the R.s as Alexandria's proposed adoptive placement by late 2012. This case is therefore unlike *In the Matter of M.K.T.*, 2016 OK 4, ¶¶ 67-72 [368 P.3d 771, 791-792], where a tribe opposed a good cause finding even though it had no available adoptive placement two and a half years after the state had assumed custody of the minor. The only delay to Alexandria's adoptive placement has been ongoing litigation over the good cause exception to the ICWA's placement preferences. There is no need to find good cause as a matter of law to avoid a conflict with the Act.


**D.      There is substantial evidence to support the court's conclusion that the P.s have not shown good cause to depart from the ICWA preferences.**

*Substantial evidence standard of review*


In evaluating whether there is substantial evidence to support the court's finding that there was no good cause to depart from the ICWA's placement preferences, we apply the standard of review stated in *Alexandria I*.[17] "When a party appeals a good cause determination, the appellate court usually applies a substantial evidence standard of review. (*Fresno County, supra*, 122 Cal.App.4th at pp. 644-646.) 'Under this standard, we do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence, or reweigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence supporting a contrary finding. [Citations.] The appellant has the burden of showing there is no evidence of a sufficiently substantial

---

[17] We acknowledge the P.s seek an abuse of discretion standard of review, because a court making a good cause determination must make factual findings and then apply the facts to legally relevant factors. The County recommends a hybrid approach used by some courts when reviewing application of the beneficial parental relationship exception to termination of parental rights under Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i). Having reviewed the record on appeal, we would affirm under either standard. (See, e.g., *In re G.B.* (2014) 227 Cal.App.4th 1147, 1166, fn. 7.)

27

nature to support the court's findings. [Citation.]' (*In re G.L.* (2009) 177 Cal.App.4th 683, 697-698.)" (*Alexandria I, supra*, 228 Cal.App.4th at p. 1352.)

*Substantial evidence supports a finding of no good cause*

The P.s focus on what they characterize as uncontradicted expert testimony that Alexandria would definitely suffer significant harm if her primary attachment to the P.s was broken. They argue that because the Evidence Code section 730 expert Doi Fick gave no opinion on that topic, the court's finding of no good cause lacked evidentiary support. They also claim there was no evidence to support the court's assumptions that the tribe would be available to support Alexandria's transition, and that Alexandria saw the R.s as family.

The absence of a report contradicting the opinion of the P.s' retained expert and the fact that the court drew inferences from evidence about Alexandria's access to a support system in Utah does not lead to the inevitable conclusion that there was no substantial evidence to support the court's ruling. Instead, viewing the record as a whole and in the light most favorable to the court's finding, we conclude that the evidence presented by minor's counsel, the Department, and the tribe regarding Alexandria's ability to navigate and develop new attachments; the benefits of preserving the connection to her extended family, half-siblings, and her cultural identity; and the adverse effects of the P.s' unwillingness or inability to support Alexandria's relationship with the R.s, constitute substantial evidence that good cause did *not* exist to depart from the ICWA's placement preferences.

The P.s primarily rely on four cases they contend establish that the risks of harm to a child removed from a long term placement are sufficient to establish good cause: *In re N.M.* (2009) 174 Cal.App.4th 328, 335; *In re A.A.* (2008) 167 Cal.App.4th 1292; *Fresno County, supra,* 122 Cal.App.4th 626; and *In re Brandon M.* (1997) 54 Cal.App.4th 1387. In each of these cases the lower court found that good cause had been proven, and the appellate court upheld the determination. Our case comes to us in the opposite

28

procedural posture. The P.s were the party with the burden of proof, needing to demonstrate good cause by clear and convincing evidence. (*Alexandria I*, *supra*, 228 Cal.App.4th at pp. 1348-1352.) To establish that the lower court's decision was erroneous, they would need to demonstrate that viewing the evidence in the light most favorable to the court's finding, no judge could reasonably reach the same conclusion. (See, e.g., *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

We understand the court's decision was not an easy one. When an Indian child has been in a stable foster placement for a long period of time, a court's inquiry into whether good cause exists to depart from the ICWA's placement preferences is one of the most difficult determinations a court can make. The pertinent inquiry on appeal is whether substantial evidence supports the finding, not whether a contrary finding might have been made. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

The most significant evidence in support of the court's finding is the report and testimony by Doi Fick. According to Doi Fick, "Alexandria has formed a safe, secure, primary attachment to the [P.s]. She has formed sibling attachments to the [P.s'] children . . . . These attachments have made it possible for Alexandria to form collateral attachments to other meaningful people." Alexandria had been able to form meaningful and affectionate collateral attachments to the R.s and her half-sisters, Anna and Kayla. Doi Fick noted that if Alexandria were to lose her strong sibling relationship with Anna, it would shake her sense of identity. Both Doi Fick and Alexandria's therapist Wejbe felt the R.s would be supportive of a continued relationship between Alexandria and the P.s. Both also expressed concern that the P. family would be unable to support a continuing relationship between Alexandria and the R.s and her half-sisters, Anna and Kayla. The R.s were also better able to provide Alexandria with a connection to her cultural identity, as Ginger previously had a close relationship with Alexandria's paternal grandmother, Sharon L.

In the section of her report titled, "Opinion and insight on Alexandria's mental and/or emotional health if relationship and/or attachment she has with the P. family is broken," Doi Fick proffered that there need not be a break in Alexandria's relationship

with the P.s, and that continuing to maintain some sort of relationship would benefit Alexandria: "Alexandria is a resilient child who has developed coping and adjustment skills. Change is not without reaction. Many of the behaviors and/or anxiety symptoms described by the [P.s] are due to lack of support within their home, conflicted emotions stimulated by the other children, or issues commonly addressed by therapists when such changes are occurring." Doi Fick was concerned that a continued loyalty conflict, where Alexandria felt the need to please both the P.s and the R.s, would affect Alexandria negatively.

Doi Fick acknowledged Alexandria's move would be difficult, but opined Alexandria has "the emotional resilience, and adaptive, adjustment, and coping skills to resolve a change in place." Doi Fick believed that with therapeutic assistance, Alexandria would be able to adjust and form a new primary attachment with the R.s. "Her adaptive and coping ability indicate that a positive outcome is likely and with therapeutic assistance, she would likely make a successful adjustment, especially if the [P.s] will continue to maintain a supportive relationship with her."

The P.s argue that because Doi Fick did not directly state an opinion on whether Alexandria was at significant risk of substantial harm based on a move to Utah, her opinion lacks the weight and specificity necessary to counter their own expert's opinion that Alexandria would suffer trauma if her primary attachment to the P.s was broken. The lack of a direct correlation between the two expert opinions is not a basis to ignore Doi Fick's observations and conclusions. Doi Fick testified that because Alexandria had a strong collateral bond with the R.s, looking to them for nurturance, structure, and cooperation, and was able to form that collateral bond based on her strong primary bond with the P.s, she would be able to transition to custody with the R.s. She also explained that children are able to have multiple primary attachments in situations with divorced parents or a caretaker who cares for a child from a young age. The P.s' emphasis on possible trauma to Alexandria resulting from a move away from the P.s ignores the strength of her connection to the R.s. The court in its ruling emphasized Alexandria was not being placed "into a family that it significantly unknown to the child," but rather her

30

placement would reinforce the bond she already had with the R.s, and would give her the "opportunity to bond with, to live with, to grow up with" two of her siblings as well.

The P.s disagree with the premise of Doi Fick's report that placement with the R.s does not necessarily mean that Alexandria's bond with the P.s must be broken. Dependency law, however, recognizes that unusual arrangements are occasionally crafted to serve the best interests of a child. For example, a parent who is unable to provide day-to-day care for a child may sometimes be permitted to maintain a relationship with the child, while another adult takes up permanent guardianship. (See, e.g., Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i); *In re Scott B.* (2010) 188 Cal.App.4th 452, 470 [applying parent-child relationship exception to conclude that guardianship, rather than adoption, was the correct permanent plan].)

Additional evidence weighing against a good cause finding is that the R.s offer Alexandria a better opportunity to maintain a relationship with two of her siblings, Anna and Kayla. Fourteen-year-old Anna has known the R.s most of her life, and for a time was living with them. Infant Kayla was placed with the R.s sometime shortly after her birth in March 2015. Alexandria first met her during a visit with the R.s when Kayla was just three weeks old, and had seen Kayla on all her visits with the R.s up to the September 2015 good cause hearing. At trial, the P.s relied heavily on e-mails to demonstrate that they had attempted to arrange visits between Alexandria and Anna, but evidence of these unsuccessful efforts does not negate the fact that the R.s had been able to provide Alexandria contact and a meaningful connection with her siblings, where the P.s had not. The P.s also argue on appeal that there was no substantial evidence to support Judge Diaz's statement that placement with the R.s would give Alexandria the "opportunity to bond with, to live with, [and] to grow up with" her siblings. While the P.s' brief speculates about whether Anna has continued contact with the R.s and whether Kayla remained with them after the September 2015 hearing, there is no evidence supporting the speculation. The evidence from the September 2015 hearing established that Anna was living down the street from the R.s, and that Kayla had lived with the R.s since her birth in March 2015 until the hearing. Both Anna and Kayla have come with the R.s to

31

visit Alexandria, and Alexandria visited with both on a visit to Utah. The most reasonable inference from the evidence is that the R.s can best facilitate a continuing relationship between Alexandria and Anna, as well as ensuring that Alexandria and Kayla develop a relationship as they both grow older. Because there was substantial evidence that Alexandria's relationship with her siblings was meaningful and significant, it was reasonable for the trial court to consider the potential long-term benefit of preserving these relationships in weighing Alexandria's best interests.[18]

The P.s also attempt to paint the record as lacking in hard evidence of the R.s' ties to Choctaw culture. Ginger R.'s testimony on this point is sufficient to support a reasonable inference that she will be more effective than the P.s with giving Alexandria access to her cultural identity.

The P.s argue that the lower court and respondents placed too great an emphasis on the P.s' knowledge, when they accepted Alexandria into their home, that the placement was temporary and the ICWA's placement preferences applied. They ask us to view the bond from Alexandria's perspective, noting that a two-year-old cannot be asked to understand the concept of a "temporary placement." However, this argument does not adequately respond to an issue raised by the evidence, which is a concern about the extent to which the P.s were unable to carry out their role as foster parents in supporting Alexandria as she developed a relationship with the R.s, who the tribe had identified as an adoptive placement. Evidence of their resistance to increasing visitation, and evidence they insisted that visits and therapy include the entire P. family, rather than Alexandria alone, gives further support to the court's finding that Alexandria's best interests weighed in favor of a change in placement.

Taken together, the evidence and testimony presented at the September 2015 hearing provide substantial evidence to support the court's decision that the P.s did not

---

[18] In fact, under the new regulations that will take effect in December this year, the preservation of such sibling relationships is an explicit consideration when a court is deciding whether good cause exists to depart from the ICWA's placement preferences. (81 Fed.Reg., *supra*, at p. 38874.)

32

carry their burden of proving good cause to depart from the ICWA's placement preferences.

*Opposing positions of the P.s and minor's counsel*

The P.s also do not—and in our view cannot—provide an adequate response to an issue raised most effectively by minor's appellate counsel. Even though they appear before the court by virtue of their status as de facto parents, the P.s' efforts to show good cause are motivated by their own interests. Minor's counsel, not the P.s, has a legal and ethical obligation to represent Alexandria's interests.[19] (*In re Josiah Z.* (2005) 36 Cal.4th 664, 675-677.) The P.s lack the right to assert Alexandria's interests because Alexandria has her own counsel, who represents her interests and also acts as her guardian ad litem. (*In re Zamer G.* (2007) 153 Cal.App.4th 1253, 1263-1271 [discussing the role of minor's counsel and guardian ad litem and explaining "it is the attorney's role to make a reasonable independent determination of the minor's best interests, notwithstanding the minors' preferences"]; see also Welf. & Inst. Code, §§ 317, subd. (e)(1) ["[c]ounsel shall be charged in general with the representation of the child's interests"] and 326.5 [child's guardian ad litem may be an attorney or a court-appointed special advocate]; Cal. Rules of Court, rules 5.660 and 5.662.) In this case, Alexandria's trial counsel, who replaced prior counsel in October 2014, had visited the minor in multiple settings and established a good rapport with her. For example, when it became necessary to inform Alexandria about a change in plans for a visit with the R.s, requiring an unexpected transition back to the P.s for a family barbeque, minor's counsel informed Alexandria of the change. The court's Evidence Code section 730 expert expressed surprise at the ease with which Alexandria accepted the change in plans, and when she asked Alexandria who explained

_____

[19] We cannot agree with the statement in the P.s' opening brief that "Minor's trial counsel, who vigorously represented the interests of the R.s, consistently fought the premise of this Court's remand." The record demonstrates that minor's trial counsel was consistently focused on the best interests of her client Alexandria, and comported herself in a professional and ethical manner.

it to her, Alexandria confidently replied "Jennifer [minor's counsel] explained it. She's nice."

We recognize that the P.s are claiming that Alexandria's best interests are served by a finding of good cause, but their argument is undermined by the fact that minor's counsel argued just the opposite. We are unaware of any published case where a court has upheld a departure from the ICWA's placement preferences contrary to the position of the minor. In other words, in every published case upholding a good cause finding, counsel for the minor either advocated for the finding, was aligned with the party advocating for a finding of good cause, or was silent. (See, e.g., *In re N.M., supra*, 174 Cal.App.4th at p. 334 [affirming good cause finding in case where father, the tribe, and the Department all favored the ICWA-compliant placement with the paternal grandmother, while minor's counsel favored departure from the ICWA and placement with non-relative]; *In re A.A.*, *supra*, 167 Cal.App.4th at pp. 1329-1330 [affirming good cause finding against tribe and relatives advocating moving minors into an ICWA-compliant placement from their stable foster placement, where minor's counsel was silent]; *Fresno County*, *supra*, 122 Cal.App.4th at p. 632 [affirming good cause finding where minor's attorney opposed recommendation by tribe, Department, and mother to follow the ICWA's placement preferences].) The P.s fail in their attempt to analogize this case to others where minor's counsel supported a non-ICWA-compliant placement as being in a child's best interests, because here, minor's counsel supported an ICWA-compliant placement, presented evidence, and argued against a good cause finding.

E. **The court's evidentiary rulings were not an abuse of discretion.**

We review the lower court's evidentiary decisions for abuse of discretion. (*In re Roberto C.* (2012) 209 Cal.App.4th 1241, 1249.)

*Exclusion of McMahon's initial report*

The P.s claim that the court erred when it initially deferred their request to conduct a bonding study, and then erred again when it excluded the full report prepared by their bonding and attachment expert, McMahon. The error, if any, was harmless.

First, while the P.s claim they were prejudiced by the court's delay in appointing a bonding expert, there is no admissible evidence of an earlier request in the record. Instead, the P.s cite to the argument of their own counsel in July 2015, after the Evidence Code section 730 expert had completed her report.

Second, the court had before it ample evidence about the extent to which Alexandria had bonded to the P.s, and the extent to which a change in placement would create a significant risk of serious harm. Well in advance of the September 2015 good cause hearing, the court appointed a neutral evaluator, Doi Fick, under Evidence Code section 730. The court's appointment order directed Doi Fick to examine Alexandria, the P.s, and the R.s, and to speak with Alexandria's therapist Wejbe, as well as any other person she deemed necessary and appropriate. The order directed Doi Fick to prepare a report containing her opinions, findings and conclusions on nine different issues, including Alexandria's attachment to the P.s and the R.s, "the trauma or impact on Alexandria's mental and/or emotional health" if her attachment with the P. family was broken, and how open the P.s and the R.s were to discussing her psychological and emotional well-being. To the extent the P.s believed Doi Fick had not adequately addressed the required topics in her report, they did not raise an objection. More importantly, no party argued that Alexandria was not bonded to the P.s, and the only portion of McMahon's report that was removed pertained to her observations of and interactions with Alexandria.

Third, the court's decision to exclude portions of McMahon's report were based on counsel's failure to advise the expert of the limitations the court had placed on her activities. The court had wide discretion on this issue, and even if it was error to exclude the report, any error was harmless because it was undisputed that Alexandria had a

35

strong, primary attachment to the P. family. McMahon testified at the good cause hearing and gave her opinion about the importance of stability and the likelihood Alexandria would suffer trauma. The fact that portions of her report based on her observations of Alexandria had to be removed before her report was admitted into evidence does not rise to the level of prejudicial error.

*Cross-examination of social worker*

Relying on his discretion under Evidence Code section 352, Judge Trendacosta denied the P.s' request to call Wilson, the Department social worker, as a witness. Later, the P.s sought to either cross-examine Wilson or have Wilson's reports excluded. Judge Diaz did not take any new testimony, and so did not grant either request.

The P.s argue that it was an abuse of discretion per se to consider the reports without allowing them to cross-examine the author, citing to *In re Matthew P.* (1999) 71 Cal.App.4th 841, 851-852. The facts here are more analogous to those at issue in *In re Damion B.* (2011) 202 Cal.App.4th 880. In that case, medically-fragile twins had lived with de facto parents since they were six months old, and the social service agency recommended that the children be returned to their mother. De facto parents opposed the recommendation, and sought an evidentiary hearing. The dependency court noted that it had appointed counsel to represent de facto parents, and had considered evidence in the form of caretaker information forms, but it would not permit de facto parents to cross-examine the social worker. (*Id.* at pp. 883-887.) The Court of Appeal affirmed because de facto parents had ample opportunity to make their position known to the court, unlike the parents in *In re Matthew P.*, who had been denied any opportunity to fully present their position. In the hearing before Judge Trendacosta, the P.s had ample opportunity to present evidence, testimony, and argument. The P.s called five witnesses, including a social worker and two experts who were critical of Doi Fick's report. The court hearing took place over five separate days, with a total of ten witnesses. The court reasonably exercised its discretion, because any testimony by Wilson would be cumulative of

36

testimony already before the court. As Judge Trendacosta made clear when he denied the request to have Wilson on call to testify, the P.s had already "testified at some length about their communication, or . . . lack thereof, with the Department," and the hearing was not focused on what the Department did or did not do. Similarly, Judge Diaz did not abuse his discretion in denying the P.s' motion to either exclude the Department reports or permit examination of Wilson.

*Request to present additional evidence or testimony*

The P.s argue that a court cannot make credibility determinations or assign relative weight to evidence without hearing live testimony. We disagree. Judge Diaz was following our peremptory writ in assuring that the matter was resolved as promptly as possible, and permitting live testimony would only delay a decision. In our peremptory writ, we specifically directed, "Absent a determination of good cause in the discretion of the dependency court, the court is not obligated to consider additional evidence on the issue of placement." (*R.P. v. Superior Court* (Nov. 25, 2015, B268111) [nonpub. opn.].) We also directed the court to resolve the issue of placement within 30 days.

Although the P.s requested to present additional testimony, they did not establish that there was good cause to do so. Their only argument was that a half-year had passed, and additional evidence, including testimony from Alexandria and her kindergarten teacher, would assist the court in making its decision. Simply put, since Judge Diaz was well aware of our November 25, 2015 order and the need to resolve the good cause issue expediently, he did not abuse his discretion in denying the request for additional testimony.

To the extent the P.s are arguing that the court could not make credibility determinations without live testimony, they are essentially arguing that Judge Diaz should have conducted a new good cause hearing, rather than reviewing the court records and the earlier hearing transcripts to make his determination. That was never our intent. Principles of appellate review constrain the appellate courts from making credibility

37

determinations through transcripts alone.  (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 494.)  But there is no bar to a judge reviewing the record to reach a determination, even in a criminal case.  (See, e.g., *People v. Collins* (2010) 49 Cal.4th 175, 257-258 [not a denial of due process for a judge other than the original trial judge to review the record and rule on a motion under Penal Code section 190.4, subdivision (c), for an automatic application to modify a death penalty verdict].)

## DISPOSITION

The court's order finding no good cause to depart from the ICWA's adoptive placement preferences and directing Alexandria to be placed with the R.s is affirmed.


KRIEGLER, J.


We concur:


TURNER, P.J.


BAKER, J.