Filed 8/24/23  Valerie W. v. Superior Court CA5

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| VALERIE W., | |
| Petitioner, | F086300, F086302 |
| v. | (Super. Ct. No. 22CEJ300348-1) |
| THE SUPERIOR COURT OF FRESNO COUNTY, | |
| Respondent; | **OPINION** |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, | |
| Real Party in Interest. | |
| STEVEN S., | |
| Petitioner, | |
| v. | |
| THE SUPERIOR COURT OF FRESNO COUNTY, | |
| Respondent; | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES, | |
| Real Party in Interest. | |

### THE COURT[*]

ORIGINAL PROCEEDINGS; petitions for extraordinary writ.  Adolfo M. Corona, Judge.

---

[*]  Before Poochigian, Acting P. J., Snauffer, J. and DeSantos, J.

Robert A. Wyrick; Law Office of Kevin G. Little and Kevin G. Little for Petitioner, Valerie W.

Franz A. Criego for Petitioner, Steven S.

No appearance for Respondent.

Daniel C. Cederborg, County Counsel, and Ashley N. McGuire, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

Valerie W. (mother) and Steven S. (father) (collectively, parents) are the parents of a son, K.S., who is now 10 months old (baby). At a contested jurisdiction/disposition hearing in May 2023, the juvenile court adjudged the baby as a dependent under Welfare and Institutions Code[1] section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), (e) (severe physical abuse) and (i) cruelty based on allegations the baby suffered multiple fractures while in his parents' care that were sustained nonaccidentally. The juvenile court denied the parents reunification services (§ 361.5, subd. (b)(5) & (6)) and set a section 366.26 hearing for September 5, 2023.

Mother and father each filed an identical extraordinary writ petition (Cal. Rules of Court, rule 8.452),[2] to vacate the section 366.26 hearing and direct the juvenile court to either order the provision of reunification services and visitation or grant them custody of the baby and terminate dependency. They also request we stay the section 366.26 hearing pending this decision. In their petitions, which we consolidated for decision on our own motion, they contend the juvenile court erred in denying father's requests to: (1) allow his two expert witnesses to appear remotely; (2) appoint those same experts to

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

[2]     Rule references are to the California Rules of Court.

assist him at court expense; and (3) relieve minor's counsel for failing to advocate for the baby's best interest.[3] We deny the petitions and requests for stay.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Referral*

On November 12, 2022, the Fresno County Department of Social Services (department) received a referral concerning then seven-week-old baby, who the parents had taken to the emergency room at Valley Children's Hospital (Children's Hospital). Father reported he, mother, and maternal grandmother took the baby to the hospital because maternal grandmother saw the baby's arm was lower than the other and his chest was poking out; she told father and mother to take him to the hospital.

An X-ray revealed the baby had an acute fracture to his right clavicle without misalignment, as well as multiple healing rib fractures and buckle fractures to his right radius and ulna. A total of 13 ribs were fractured—on the right side, five posterior ribs and two anterior ribs were fractured, and on the left side, five posterior ribs and one anterior rib were fractured. There appeared to be a bruise on the baby's right front shoulder. The baby was admitted to the hospital. The attending pediatrician, Dr. Yoshihiro Ozaki, was concerned about suspected child abuse.

Social worker Steven Ridley met with Officer J. Mills from the Fresno Police Department at Children's Hospital on November 12, 2022. Father thought the baby's shoulder injury could have occurred when the baby's arm became stuck between the changing table and crib when father was picking the baby up a few days ago. Mother and

---

[3]     The Fresno County Department of Social Services argues mother lacks standing to raise father's issues in her writ petition because her interests were only speculatively harmed by the denial of father's requests and motions, and therefore she was not aggrieved by those denials. We disagree, as mother asserts her own harm from the denial of father's motions, which affected her interests as much as father's interests in challenging jurisdiction. At the very least, mother has joined in the issues father asserts in his writ petition, so we would address those issues anyway.

maternal grandmother also reported the rib fractures may have occurred when, about two or three weeks ago, their 40- to 50-pound dog was found on the bed with the baby and mother thought the dog may have jumped on the baby. Mother reported that two nights ago they were at paternal grandmother's house when the baby became fussy and was crying when they changed him and put him in the car seat, which was not normal behavior.

The police placed a protective hold on the baby.

*The Investigation*

On November 14, 2022, social worker Nicole Perez spoke with Dr. Hubbard from Child Advocacy. He advised there were concerns of nonaccidental trauma and that the parents did not notice the swelling. The baby did not have any cranial bleeds, retinal hemorrhaging, or spinal injuries. The baby's legs could not be assessed because they were fully casted to treat his bilateral club foot. They were assessing the baby for osteogenesis imperfecta, but the labs would not be available for another week. Dr. Hubbard did not believe the family's explanations for the baby's injuries were plausible. Perez and another social worker went to the family's home that day, which they found to be clean and to have abundant food and all the necessary baby supplies.

On November 15, 2022, Perez spoke with the parents, who reported they and the baby lived with maternal grandparents, and the parents were the ones who primarily cared for the baby. Perez also spoke to Dr. Hubbard, who stated the rib fractures were highly suspicious for physical abuse. Because the rib fractures were consecutive, the parents' explanation did not match up and the injuries were more consistent with the baby being grabbed by a human hand, as the fingers lined up with the ribs. The ribs, radius, and ulna showed signs of healing, but it was not possible to say when exactly the injuries occurred. Since the clavicle fracture appeared to be more recent, Dr. Hubbard believed there were at least two incidents in which the baby sustained trauma. Dr. Hubbard stated

4.

they would repeat the imaging to make sure no fractures were missed. The baby's vitamin D was low and being looked at, and bone testing was still being done.

Perez spoke with Detective Kristine Barklow from the Fresno Police Department, who was investigating the incident. It was reported to Barklow that the baby was primarily with mother due to father working, and maternal grandmother would watch the baby when mother napped. Paternal grandmother had watched the baby a handful of times. Since neither parent admitted to intentionally or accidentally hurting the baby, and they both denied everything, there was no suspect. With respect to the changing table incident, Barklow did not believe there was any way the baby's arm got stuck the way the family stated it did.

### Detention

A team decision making meeting was held on November 15, 2022. Social workers, the parents, a great uncle and aunt, maternal grandparents, and five family friends were in attendance. It was noted that Children's Hospital was continuing to run tests to rule out any bone issues. The family denied knowing how the baby was injured. The baby was seen by his primary care doctor on November 9 and 11, 2022, and no concerns were noted. The family and friends who were present did not express any concerns with the parents or family, and the parents stated they would do anything to get the baby back. Based on the number and nature of the injuries, it was determined further investigation was warranted and the department would file a petition on the baby's behalf.

The dependency petition alleged the baby was a minor described by section 300, subdivisions (a) (serious physical harm) and (b) (failure to protect) because the baby sustained serious physical harm inflicted nonaccidentally by his parents and the parents failed to provide adequate protection for him. The petition also alleged the baby's injuries and parents' conduct brought the baby within the court's jurisdiction under subdivision (e) (serious physical abuse) and (i) (cruelty).

On November 16, 2022, the juvenile court ordered the baby detained and ordered twice-weekly supervised visitation for the parents. A combined jurisdiction/disposition hearing was set for December 19, 2022.

*The December 19, 2022 Hearing*

In its report for the jurisdiction/disposition hearing, the department recommended the juvenile court sustain the petition's allegations and deny the parents reunification services under section 361.5, subdivision (b)(5) & (6). The department opined the parents' prognosis for reunifying with the baby was very poor because they had not taken responsibility, or offered a reasonable explanation, for the baby's injuries. By that time, the baby was placed with his maternal great-aunt.

Neither parent had a criminal conviction in California. There was one prior child protective referral for the family alleging general neglect of the baby and physical abuse, which was received on September 29, 2022. It was reported that the parents brought the baby the Children's Hospital Pediatric Clinic for his one-week follow up when a red lesion was observed on the left side of the baby's penis. The reporting party contacted the doctor at Children's Hospital's child abuse unit about the lesion, who advised to bring the baby into the Children's Hospital emergency room child abuse unit. The parents did so and on further investigation, a Children's Hospital urology specialist determined the baby had injured himself. Consequently, the department found the allegation to be unfounded. According to the baby's medical records, the baby was seen by Children's Hospital child advocacy physician, Dr. Daly, and a skeletal survey was performed on September 29, 2022, which was negative.

The results of the tests for osteogenesis imperfecta (OI), or brittle bone disease, were negative. The baby had a low vitamin D level, but his calcium levels were normal. The baby was placed on 2,000 units of vitamin D for six weeks due to the deficiency. Dr. Ozaki expected the injuries would have caused the baby to feel some immediate distress which would have been visible.

On December 19, 2022, the juvenile court set a settlement conference for March 13, 2023, and a contested jurisdiction/disposition hearing (contested combined hearing) for March 27, 2023. The juvenile court ordered the parties to exchange updated discovery by February 27, 2023, and the parents to file their statement of contested issues and their intended witnesses by March 6, 2023. Mother's attorney, Eric Hansen, made an oral motion pursuant to section 827 for permission to release medical records as they were in the process of obtaining a second medical opinion.[4] County counsel did not have a response to this request, as counsel needed to consult with the attorney in county counsel's office who handled section 827 requests. County counsel provided Hansen with the name and contact information for that attorney.

***The Settlement Conference***

By the March 13, 2023, settlement conference, father had retained attorney Franz Criego to represent him; he substituted into the case on March 10. On March 13, Criego filed a statement of contested issues and a witness list of 21 individuals, which included Dr. Holick from the University of Boston Medical Center and Dr. Pals from the University of Amsterdam. The statement of contested issues asserted, as an affirmative defense, that the baby had an inherited birth defect, which caused bone fragility associated with the baby's vitamin D deficiency, infantile rickets, and Ehlers Danlos syndrome, hypermobility type, which likely caused the fractures.

---

[4]    Section 827 lists classes of persons who have a right to inspect and receive copies of a juvenile case file without a court order, including a minor's parent. (§ 827, subds. (a)(1)(D) & (a)(5); *In re B.F.* (2010) 190 Cal.App.4th 811, 818.) Persons not listed in section 827, subparagraphs (a)(1)(A) to (P), however, may inspect and copy a juvenile case file when authorized to do so "by court order of the judge of the juvenile court upon filing a petition." (§ 827, subds. (a)(1)(Q), (a)(3)(A) & (a)(5).) Under section 827, a parent is prevented from disseminating juvenile court records. (*In re Tiffany G.* (1994) 29 Cal.App.4th 443, 449–450.) "Juvenile court records may not be disclosed or disseminated except by order of the juvenile court"… which "has *exclusive authority* to determine the extent to which juvenile court records may be disclosed." (*Cimarusti v. Superior Court* (2000) 79 Cal.App.4th 799, 803–804.)

At the settlement conference, county counsel expressed a concern that the baby's medical documentation had been provided to the medical professionals on the witness list without complying with section 827, although county counsel did not know what juvenile case file records the parents had or what had been provided to the doctors. The juvenile court agreed a section 827 request would have to be submitted and ruled on before any juvenile case file documents were shared. Minor's counsel shared county counsel's concern about a potential "827 violation," but he also was concerned the minor's medical information was provided without his consent, as he is the holder of the baby's medical privilege.

Mother's attorney stated he had been reaching out to the department to try to settle the case. County counsel responded the settlement discussions were specific requests that the department seek out second opinions, as the belief is that there may be another reason for the fractures, but nothing had been provided to the department to support that. Father's attorney stated there were no 827 violations, as the information shared came from father's own personal medical records, but he would provide the court with a section 827 request.

The juvenile court found insufficient evidence to show a section 827 violation occurred. The juvenile court set a settlement conference for April 17, 2023, and the trial for April 25, 2023.

***The Contested Combined Hearing***

By the April 17, 2023 settlement conference, mother was appointed new counsel after her prior counsel declared a conflict. The juvenile court confirmed the matter for trial on April 25.

The department submitted addendum reports which stated that the November 12, 2022 testing at Children's Hospital showed the baby was deficient in vitamin D, as his level was 7.5 ng/ml, and the normal range was between 30 and 100 ng/ml. The test results for invitae osteogenesis imperfecta and bone fragility were negative for genetic

disease. Follow-up tests on February 21, 2023, showed the baby's vitamin D levels were normal at 45 ng/ml; therefore, the care provider was advised to stop the vitamin D supplement. According to Dr. Hubbard there was no correlation between the fractures and vitamin D levels, and the baby's calcium and other levels were normal.

The care provider and parents had taken the baby to Dr. Cynthia Curry for genetic testing without the department's knowledge. Dr. Curry ordered genetic testing, which was negative. The police suspended the criminal case as Detective Barklow had spoken with everyone and she could not determine who was at fault.

Trial commenced on April 25, 2023. The department submitted on its reports. Father called Dr. Ozaki, a pediatric hospitalist at Children's Hospital who examined the baby in the emergency room and authorized the baby's hospital admission. Dr. Ozaki was aware the baby had a vitamin D deficiency before his discharge from the hospital. Dr. Ozaki was concerned about nonaccidental trauma based on the radiology reports of multiple fractures at different healing stages, plus the acute fractures. According to Dr. Ozaki, while vitamin D deficiency technically raises the risk of fractures as it makes it easier to get a fracture, it does not in itself cause fractures. Dr. Ozaki did not believe vitamin D deficiency itself caused the baby's fractures. Dr. Ozaki testified the healing fractures could not have occurred before birth, as a skeletal X-ray taken when the baby was 10 days old did not show any fractures.

Following Dr. Ozaki's testimony, the parties discussed how to accommodate the schedules of other doctors father had subpoenaed and whether their testimony could be taken over Zoom. In listing the doctors who might testify, the juvenile court noted Dr. Holick and Dr. Pals were on the list. Father's attorney responded they would both testify by Zoom, as they were both more than a 1,000 miles away. The juvenile court noted that minor's counsel had raised a concern about Dr. Holick testifying, which the court intended to address the following day.

9.

At the April 26 session, county counsel objected to a remote appearance by any witness in the case based on rule 3.672(i). The juvenile court responded it would sustain that objection unless all counsel agreed to Zoom testimony. County counsel and minor's counsel both objected to the lack of written notice of the request for remote testimony, which the rule of court states must be provided three court days before the hearing. Mother's counsel argued the best interest of the minor should prevail over "some procedural error," while father's counsel argued the juvenile court had discretion to allow remote testimony.

Minor's counsel also objected to the testimony of Drs. Holick and Pals, as well as any reported generated by either doctor, based on the physician-patient privilege that minor's counsel is the holder of under section 317, subdivision (f). Minor's counsel declined to waive the privilege, noting mother reached out to these doctors in January 2023 without speaking with her attorney and following the correct procedure to get minor's counsel's agreement. Minor's counsel believed the doctors were provided confidential medical records, including X-rays, MRIs, and CT scans, which they reviewed and based their findings on. Minor's counsel also was concerned about possible section 827 violations.

Following further discussion, the juvenile court continued the trial to May 9, 2023, and gave the parties the opportunity to submit briefs on the issues of physician-patient privilege, filing a section 827 petition, and allowing Zoom testimony over any objection. The juvenile court ordered any briefs or objections to be filed by May 4.

*Father's Motions*

Minor's counsel filed amended objections, and a memorandum of points and authorities regarding jurisdiction and disposition, on May 4, 2023. In the objections, minor's counsel elected not to waive the physician-patient privilege on the baby's behalf and objected, among other things, to Drs. Holick and Pals using the baby's medical records and offering any testimony or opinions.

10.

Father filed several motions on May 8, 2023.[5]  First, he filed a motion to relieve minor's counsel or, in the alternative, to dismiss the dependency petition.  Father argued minor's counsel should be relieved because he was acting in bad faith by invoking the physician-patient privilege to prevent medical testimony that was beneficial to the parents, which denied father due process.

Father also filed a motion to allow expert testimony via Zoom or telephone, in which he argued prohibiting remote testimony denied father due process, as it was father's burden to counter the presumption of abuse by presenting evidence that the baby's injury could have occurred accidentally.  In a declaration supporting the motion, father's attorney stated, among other things:  (1) he previously provided the experts' reports to all parties; (2) no objections were received prior to trial; (3) neither expert examined the baby; (4) because of the medical dispute over the cause of the baby's injuries, there was no other way for the parents to refute the allegations; (5) both experts reside and practice more than 3,000 miles from Fresno; (6) one of the experts has been diagnosed with Stage 3 cancer and his doctor had forbidden him to travel; and (7) neither parent had sufficient resources to obtain the presence of either expert.  Father also filed a request for expert witnesses, Drs. Holick and Pals, to appear remotely by videoconference on May 11, 2023, using Judicial Council form RA-025.

Finally, father filed an "Ex Parte Confidential In Camera Motion for Appointment of Experts" (unnecessary capitalization omitted), in which he asked the court to appoint Drs. Holick and Pals, at the court's expense, to assist him in the preparation and presentation of the case.  In a declaration accompanying the motion, father's attorney asserted he required the services of medical experts to allow the court to determine the

---

**5** While father's motions are contained in the clerk's transcript in his case, case No. F086302, they are not in the clerk's transcript in mother's case, case No. F086300. On our own motion, we take judicial notice of the clerk's transcript from case No. F086302 in case No. F086300.

true nature of the minor's injuries; no party had secured the testimony of any competent medical expert; county counsel and minor's counsel were informed of the true nature of the injuries yet sought to actively conceal the evidence from the court; he was prepared to show the need for an expert in more detail at an in camera hearing; and the cost for the services of Drs. Holick and Pals would not exceed $2,500, exclusive of witness fees.

At the May 9, 2023 session, the juvenile court addressed father's motions. The parties first addressed the necessity for a section 827 petition for the release of the minor's confidential records. The juvenile court believed a section 827 petition should have been filed.

At the request of father's attorney, the juvenile court held a confidential hearing on the in camera motion. At that hearing, which concerned paying for the experts, the juvenile court noted such a request was usually made well in advance of the need to pay for the cost and there was no dollar amount. The court denied the motion without prejudice, as the court needed more information on the cost.

The juvenile court next considered the motion to allow father's experts to appear by Zoom. Mother's attorney agreed with father's request. County counsel, however, objected because the request was not received three court days before the proceeding as required by the rule of court. County counsel explained it was important for the department to be able to cross-examine experts who are controversial, such as Drs. Holick and Pals, in person, which was the department's due process right.

In arguing for Zoom testimony, father's attorney asserted minor's counsel has a statutory obligation to advocate for the baby's best interest, which in his opinion would be to get all pertinent evidence regarding the baby's condition before the court. The juvenile court responded that it was not going to grant the motion to relieve minor's counsel, as minor's counsel is required to follow the rules. Minor's counsel explained he was doing his job in the baby's best interest, and while father's attorney may have a different opinion, he investigated the experts the parents were trying to present and, in his

12.

opinion, it was not in the baby's best interest to have those experts testify regarding the cause of the baby's injuries. The juvenile court denied the motion to relieve minor's counsel, or to dismiss the petition.

With respect to remote testimony, county counsel pointed out that rule 3.672(i)(5)(A) provides that the court must require a witness to appear in person unless all parties consent to the remote appearance. The juvenile court responded that if that was the rule, it would have to deny remote appearances, but if not, it would allow remote appearances. Given the rule, however, the juvenile court denied the request for Zoom appearances.

### Trial Testimony

Thereafter, trial testimony was received on May 9, 10, 11, and 15 from the following witnesses: (1) social worker Debra Chavira; (2) father; (3) paternal grandmother; (4) mother; (5) maternal grandmother; (6) maternal great-aunt; (7) Natalie Castro, who is a court writer for the department; (8) Detective Barklow; and (9) Dr. Trenton Hubbard, a child abuse pediatrician at Children's Hospital.

As pertinent here, father and mother both denied hurting the baby or knowing the baby was injured. After the incident concerning the injury to the baby's penis, in which doctors determined the baby injured himself with his club feet, the baby had between 10 and 14 doctor's visits, and no one mentioned they discovered a fracture. The baby was circumcised on November 2, and was strapped to a board during the procedure. Mother believed her long labor could have caused the baby's rib fractures, and she claimed both she and "the experts" saw rib fractures on the X-rays taken when the baby was 10 days old, which the Children's Hospital doctors missed.

The parents did internet research, and they did not believe the Children's Hospital doctors' conclusion that the baby's vitamin D deficiency did not cause the fractures. They asked the department and the doctors for a second opinion, but one was not provided. Mother contacted Dr. Curry for a second opinion, but Dr. Curry immediately

13.

stated she did not believe the baby's injuries were accidental and accused mother and other family members of abuse. Mother was aware Dr. Curry ran genetic tests which revealed the baby does not have a genetic disease and there are no genetic causes for the fractures, but mother disagreed with her opinion.

Mother sought her own medical opinion by researching different doctors. She found Dr. Holick through a Facebook group related to vitamin D deficiency or child abuse and spoke with him on Zoom. Dr. Holick told her he was medically barred from treating patients at the facility he was associated with because he was "helping families like us." Toward the end of January 2023, mother and father saw Dr. Holick, who developed the scale for vitamin D, at a university in Boston, and he examined them.

According to mother, Dr. Holick diagnosed she and father with hypermobility type Ehlers-Danlos syndrome (hEDS), which she explained is a joint disorder that causes the joints to pop and click. While the baby was not evaluated for hEDS, mother believed they passed it on to the baby because the baby's joints click and pop. Mother also had a vitamin D deficiency, which she passed on to the baby. Mother testified that Dr. Holick and Dr. Pals diagnosed the baby with infantile rickets, although neither doctor personally examined the baby, through the baby's medical records and X-rays, which mother provided to them.

Dr. Hubbard, who is board certified in general pediatrics and child abuse pediatrics, testified that he was the on-call child abuse pediatrician when a report was made related to multiple fractures. Dr. Hubbard concluded the baby's fractures were caused by nonaccidental trauma. Dr. Hubbard spoke with many other physicians, including the baby's pediatrician, Dr. Ward, the radiologist, and his colleagues in the child abuse department, and the consensus was that the baby's injuries were nonaccidental.

Dr. Hubbard explained that the baby did not have rickets, as the baby did not have the clinical, radiographic, or laboratory signs necessary to support that diagnosis. The

14.

laboratory evidence requires extremely low levels of vitamin D, calcium and phosphorus, and high levels of parathyroid and alkaline phosphatase, and while the baby was deficient in vitamin D, he did not have the other laboratory deficiencies. The baby also did not have the clinical or radiological signs to support a rickets diagnosis. Low vitamin D alone is insufficient to diagnose rickets.

An extended osteogenesis imperfecta panel was performed to test for any genetic conditions that might explain the baby's injuries, which was negative. The prior skeletal survey that was done when the baby was 10 days old was negative for any fractures or signs of osteopenic changes, meaning bone fragility, which he would expect to see if the baby had a bone fragility disease. The November 2023 skeletal surveys did not show any signs of osteopenia. Dr. Hubbard explained that a rib fracture is not visible by just looking at a child and a doctor would not easily find a rib fracture during a routine exam. Putting a plaster cast on the baby's legs would not cause the arm, radial, or clavicle fractures, and holding the baby down for circumcision was not the type of force that would cause the fractures.

Dr. Hubbard was aware the parents claimed the clavicle injury occurred when the baby's arm was caught in the changing table, but that explanation did not completely rule out nonaccidental trauma. Dr. Hubbard would not expect a severe clavicle fracture to result from routine handling of an infant and then go unnoticed. Dr. Hubbard was concerned about any fracture in a nonmobile infant. Dr. Ward, the baby's pediatrician, reached out to Dr. Hubbard, as Dr. Ward was concerned about the baby's injuries and the parents had approached her about a second opinion. Dr. Ward did not agree with obtaining one because she was under the same impression as Dr. Hubbard —that the injuries were nonaccidental trauma.

Dr. Hubbard was aware of people who believe vitamin D causes fractures in infants, but that belief is not generally accepted in the pediatric world because multiple studies have shown vitamin D levels do not correlate with fractures. While vitamin D

15.

deficiency could increase the risk of fragility fractures, the baby's fractures were not that type because there was no evidence on the X-rays of osteopenic changes or bone weakening, and the other laboratory evidence did not support that. The baby has not suffered any fractures after getting vitamin D. In Dr. Hubbard's opinion, the baby's vitamin D deficiency did not contribute to fractures he observed, but he did not know that for a fact.

According to Dr. Hubbard, there is no relationship between EDS and rickets. While mother's genetic issues could have been passed on to the baby, that did not explain the broken bones, as broken bones are not part of the diagnostic criteria for EDS. Dr. Hubbard disagreed that EDS or Marfan's disease, which are connective tissue disorders, determine a higher risk for fractures. That mother has EDS does not change his opinion of nonaccidental trauma.

### *The Trial Court's Final Rulings on Father's Motions*

During breaks in the testimony, the juvenile court held a second in camera hearing with father's counsel to consider the confidential matter and re-visited the issues of Zoom testimony and the appointment of experts. On May 11, father's attorney requested an in camera conference concerning the experts. At this conference, father's attorney stated he determined the cost of airfare alone was "relatively prohibitive" due to the short notice, as airfares from Amsterdam to California ranged from $11,000 to $22,000 one way, plus the experts would need to be paid for travel time and expenses. Father's attorney thought that would be unfair to the court system. The juvenile court stated in its estimation it would be too costly and the presiding judge would have to approve it. Consequently, the juvenile court denied the request for the court to pay for the experts based both on cost and timeliness.

On May 15, the last day of testimony, father's counsel again submitted a request to appoint Drs. Holick and Pals as experts nunc pro tunc. The juvenile court denied the request, explaining that Evidence Code section 730 experts are generally experts that are

16.

neutrally presented by the court, but these experts were hired by, and appeared to be experts for, the parents. Father's attorney then asked the court to appoint any qualified Evidence Code section 730 expert. The juvenile court denied the request to appoint Drs. Holick and Pals as Evidence Code section 730 experts, as well as the request to appoint any expert.

The juvenile court re-visited the issue of allowing father's experts to appear remotely several times during the proceedings. Ultimately, the juvenile court determined that under rule 3.672(i), it did not have discretion to order the experts to appear remotely if all parties did not consent to it, and since all the parties did not agree, it would not allow it. The juvenile court further noted that even if a remote appearance were allowed and it appointed experts, the court had not approved a section 827 petition and the baby's information could not be used without permission.

Following closing arguments on May 16, the juvenile court took the matter under submission.

### The Court's Ruling

On May 17, 2023, the juvenile court issued its ruling. The court sustained the allegations, finding the allegations under section 300, subdivisions (a), (b), and (e) true by clear and convincing evidence, and the allegations under section 300, subdivision (i) true by a preponderance of the evidence. The juvenile court ordered the baby removed from parental custody and denied the parents reunification services as recommended. A section 366.26 permanency planning hearing was set for September 5, 2023.

These petitions ensued.

## DISCUSSION

### I.      Motion to Allow Remote Testimony

Father and mother contend the juvenile court erroneously denied father's request to allow Drs. Holick and Pals to testify via video or telephonic appearance. They assert California law allows expert witnesses to testify remotely provided the parties are given

17.

notice and good cause exists. They argue father showed good cause based on the parents' indigency, the experts' distance from California, and that one expert had a medical condition; therefore, the juvenile court erred in denying father's motion, "resulting in irreparable harm and significant prejudice" to father and mother.

### A. Remote Appearances in Juvenile Court

In 2012, the Judicial Council adopted rule 5.531 to establish "standards" in juvenile court proceedings that apply to "any appearance or participation in court by telephone, videoconference, or other digital or electronic means authorized by law." (Rule 5.531(a).) Rule 5.531 requires courts to develop "[l]ocal procedures or protocols" to ensure the "fairness and confidentiality of any proceeding in which a party is permitted by statute, rule of court, or judicial discretion to appear by telephone." (Rule 5.531(b).) These procedures or protocols are required to: "(5) Establish a deadline of no more than three court days before the proceeding for notice to the court by the party … of that party's intent to appear by telephone…." and "(6) Permit the party, on a showing of good cause, to appear by telephone even if he or she did not provide timely notice of intent to appear by telephone." (Rule 5.531, (b)(5), (6).) Nothing in rule 5.531, however, "confers on any person an independent right to appear by telephone, videoconference, or other electronic means in any proceeding. (Rule 5.531(c).) Before this rule was adopted, appellate courts had held the juvenile court has discretion to permit a witness to testify telephonically. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1176.)

In 2021, the Legislature enacted Code of Civil Procedure section 367.75 to address the use of remote technology in civil cases, including juvenile dependency cases, which became effective on January 1, 2022. (Stats. 2021, ch. 214 (S.B. 241), § 5.)[6] With

---

[6] When enacted, Code of Civil Procedure section 367.75 was to remain in effect only until July 1, 2023. (Code Civ. Proc., former § 367.75, subd. (*l*).) In 2023, the effective date of the statute was extended to January 1, 2026. (Code Civ. Proc., § 367.75, subd. (m).)

respect to juvenile dependency proceedings, the statute provides, as pertinent here, that any such proceeding "may be conducted in whole or in part through the use of remote technology subject to the following:  [¶] … [¶]  (2) Any party to the proceeding may request that the court compel the physical presence of a witness or party.  A witness, including a party providing testimony, may appear through remote technology *only with the consent of all parties* and if the witness has access to the appropriate technology." (Code Civ. Proc., § 367.75, subd. (h)(2), italics added.)

Code of Civil Procedure section 367.75 requires the Judicial Council to "adopt rules to implement the policies and provisions in this section to promote statewide consistency."  (*Id.*, § 367.75, subd. (*l*).)  To that end, the Judicial Council adopted rule 3.672 "to promote greater consistency in the practices and procedures relating to remote appearances and proceedings in civil cases."  (Rule 3.672(a).)  Rule 3.672(i) governed juvenile dependency proceedings when the trial in this case took place in April and May 2023.  (Rule 3.672(b)(1) ["[p]rovisions that apply specifically to juvenile dependency proceedings are set out in subdivision (i)"]; rule 5.531(a) [subds. (b) and (c) of rule 5.531 are suspended from Jan. 1, 2022, to July 1, 2023, and "the applicable provisions in rule 3.672 govern remote appearances and proceedings in juvenile court"].)

With respect to a witness's remote appearance, "[a] request for a remote appearance by a witness must be made in writing by counsel for the party calling the witness … by filing the request with the court and serving a copy of the request on counsel for all other parties … by any means authorized by law reasonably calculated to ensure receipt no later than close of business three court days before the proceeding." (Rule 3.672(i)(3)(B)(ii).)  A request to appear remotely may be made on Judicial Council form RA-025.  (Rule 3.672(i)(3)(B)(i).)  In determining whether to grant that request, "[t]he court must require a witness to appear in person *unless all parties to the proceeding have consented to the witness's remote appearance*."  (Rule 3.672(i)(5)(A), italics added.)

19.

Courts are authorized to adopt local rules to prescribe procedures for remote juvenile dependency proceedings if "the procedures are posted on the court's website and consistent with Code of Civil Procedure section 367.75 and subdivision (i)." (Rule 3.672(e)(3) & (i)(1)(a).) The Fresno County Superior Court enacted such a rule for remote proceedings in juvenile court cases, namely, the Superior Court of Fresno County, Local Rules, rule 6.1.7, which became effective on September 15, 2022 (local rule 6.1.7).

Local rule 6.1.7(D)(3) provides that all trial and evidentiary hearings in juvenile dependency cases "shall be conducted in person, unless otherwise ordered by the assigned judicial officer." When setting an evidentiary hearing, the parties should discuss at the pretrial settlement conference whether the matter will proceed in person or remotely and "whether remote testimony is agreed upon for any witness." (Local rule 6.1.7(D)(3)(a) & (b).) Local rule 6.1.7(D)(3)(c)(1) provides: "The court may grant leave for a witness to appear remotely <u>when stipulated by all parties.</u> [¶] 1) A request for a witness to appear remotely with the consent of all parties *must* be made in writing no later than five (5) court days before the hearing. It is the burden of the party proferring the witness to file the request or present the stipulation and to certify that all parties consent to the remote testimony."

### B.    Analysis

The statute, rule of court, and local rule all clearly state that a court may grant a request for a witness to appear through remote technology only with the consent of all parties to the proceeding. (Code Civ. Proc., § 367.75, subd. (h)(2); rule 3.672(i)(5)(A); local rule 6.1.7(D)(3)(c).) It is also clear from the record that while mother's attorney agreed with father's request, both county counsel and minor's counsel did not consent to Drs. Holick and Pals appearing remotely. The juvenile court denied the request because it did not believe it had the discretion to order remote appearances if all the parties did not consent to that.

20.

The juvenile court is correct. Neither the statute, the rule of court, nor the local rule give the juvenile court discretion to override a party's decision not to consent to the remote appearance of a witness and do not require a nonconsenting party to justify that decision. The parents do not point to any authority that would allow for remote appearances over a party's objection. While they cite to Code of Civil Procedure section 367.75, the subsections they cite to concern civil proceedings, not juvenile dependency proceedings that are governed by section 367.75, subdivision (h).[7] Parents assert California law is clear that experts should be allowed to testify telephonically if notice is given to all parties and good cause exists. But that law does not apply to juvenile dependency proceedings. It is not clear why the Legislature requires all parties to consent to a witness's remote appearance in dependency proceedings and does not grant the juvenile court discretion to override a nonconsenting party. We, however, are constrained by the statute, rules of court, and local rules to conclude the consent of all parties is required and the juvenile court has no discretion to order a remote appearance absent that consent.[8]

We also note, as the department asserts, that father's request for witnesses to appear remotely was not timely, as it was not filed with the court and served on all parties either three or five court days before the contested proceeding began. The initial settlement conference for the combined contested hearing took place on March 13, 2023,

---

[7] For example, Code of Civil Procedure section 367.75, subdivision (c) permits an expert witness to "appear remotely absent good cause to compel in-person testimony." That subsection, however, applies to civil cases, not juvenile dependency cases. Notably, section 367.75, subdivision (h) does not carve out an exception for expert witnesses. Instead, the consent requirement applies to all witnesses.

[8] By their terms, Code of Civil Procedure section 367.75, subdivision (h)(2) and rule 3.672(i)(5) remove any discretion a juvenile court may have had to order remote testimony over a party's objection. We urge the Legislature to review the statute with respect to granting the juvenile court discretion to order remote testimony in circumstances such as those present in this case.

when the juvenile court accepted father's substitution of attorney and relieved his previously court-appointed counsel for privately retained counsel. On that date, father filed a statement of contested issues and witness list that listed Drs. Holick and Pals as witnesses, but he did not request that they appear remotely or discuss whether the other parties would agree to remote testimony. The second settlement conference took place on April 17, 2023, where the matter was confirmed for trial, but father did not request remote appearances for the expert witnesses. The combined contested hearing began on April 25, 2023, and while father's attorney mentioned that Drs. Holick and Pals would testify via Zoom, father did not file his written motion to allow his experts to appear via remote technology until May 8, 2023, which was served on the other parties' attorneys that same date. The request was untimely because it was filed 13 days after the hearings commenced.

In sum, the juvenile court did not err in denying father's request for Drs. Holick and Pals to appear remotely, as not all parties consented and the request was untimely.

## II. Motion to Appoint Experts

Father and mother contend the juvenile court erred in denying father's motion to appoint Drs. Holick and Pals as medical experts to assist father in preparing and presenting his case. Mother asserts these medical experts would be critical to the defense of her case as well. They assert the juvenile court should have appointed experts that would present a different opinion on the mechanism of the baby's injuries, and its failure to do so resulted in a denial of due process and prejudice to father and mother, as it deprived father of the ability to rebut the department's evidence.

### A. *The Appointment of Experts*

Pursuant to Evidence Code section 730, a court may appoint an expert on its own motion or the motion of a party "[w]hen it appears to the court … that expert evidence is or may be required by the court or by any party to the action." An expert is appointed because "expertise is, or may be, required to resolve issues in the case." (*In re S.R.*

(2009) 173 Cal.App.4th 864, 869.) While the juvenile court may appoint a medical expert for an indigent parent in a dependency proceeding under Evidence Code section 730, where the expert is appointed to only examine and report on existing records, the expert is not a confidential expert and the expert's report and testimony is available to all parties. (*Collins v. Superior Court* (1977) 74 Cal.App.3d 47, 53–55.)[9]

The decision whether to appoint an expert under Evidence Code section 730 is confided to the juvenile court's sound discretion, and we review the court's decision for abuse of discretion. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339, 1341; *In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1084.) The court abuses its discretion when it acts in a manner that is arbitrary, capricious, or patently absurd. (*In re Mark V.* (1986) 177 Cal.App.3d 754, 759.) A juvenile court does not abuse its discretion in denying a parent's belated request for appointment of an expert pursuant to Evidence Code section 730, made on the day of a hearing that had been pending for several months. (*In re M.M.* (2022) 81 Cal.App.5th 61, 68–69, review granted Oct. 12, 2022, S276099.)

### B. Analysis

On the second day of the combined contested hearing, father requested the appointment of Drs. Holick and Pals because he wanted the court to pay for their transport to the hearing so they could testify in person. The juvenile court denied that request because it was too costly, which even father's attorney conceded. On the last day of testimony, father's attorney again asked the juvenile court to appoint Drs. Holick and Pals. The juvenile court denied that request because they were not neutral experts, but

---

[9]     Parents assert the showing of a need for appointment of an expert witness may be made ex parte in camera, citing *Torres v. Municipal Court* (1975) 50 Cal.App.3d 778. The appellate court in *Collins v. Superior Court* determined that case was not controlling in a juvenile dependency proceeding where the expert is appointed to examine the minor's medical records and consult with counsel regarding them, as the medical records are not the parents' confidential communications. (*Collins v. Superior Court*, *supra*, 74 Cal.App.3d at pp. 52–54.)

rather retained by the parents. Father's attorney then asked to appoint any expert under Evidence Code section 730. The juvenile court denied that request.

The juvenile court did not abuse its discretion in denying father's requests. First, the requests were untimely. The first motion, which requested the appointment of father's retained experts, was filed nearly five months after the combined contested hearing first was set and nearly two months after the initial settlement conference, and father did not request appointment of a neutral expert until the final day of testimony. As the department points out, section 352, subdivision (b) provides that courts shall not grant continuances that would cause the disposition hearing to be completed more than six months after the detention hearing, and nearly six months from the November 16, 2022 detention had passed when father requested the appointment on May 9, 2023. If the juvenile court were to grant father's belated requests for court-appointed experts, the combined contested hearing, which had already begun, would have to be continued to secure the attendance of the retained experts or to allow for a neutral expert to be located and for that expert to conduct an individual assessment, provide a report, and testify.

Moreover, father did not seek the appointment of a neutral expert, but rather the appointment of his retained experts so the court would pay for one or both to be transported to the hearing. As father's attorney conceded below, that would be cost prohibitive and place an unfair burden on the court system. Accordingly, the juvenile court did not abuse its discretion in denying the motion on that basis. While father later requested appointment of a neutral expert on the last day of testimony, the juvenile court reasonably could find that request was untimely.

Parents assert that, like an indigent defendant in a criminal proceeding who has the constitutional right to reasonably necessary ancillary defense services, including expert witnesses (*Corenevksy v. Superior Court* (1984) 36 Cal.3d 307, 318–320), they have the right to appointment of an expert witness if they demonstrate both indigency and the necessity for one (*People v. Worthy* (1980) 109 Cal.App.3d 514, 520–521). Even so, the

24.

request was untimely and the cost prohibitive; the juvenile court did not abuse its discretion in denying father's requests on those bases.

Moreover, even if the juvenile court erred in denying the request to appoint the experts, parents have not shown prejudice from the denial. Parents assert the juvenile court's denial deprived them of the ability to counter the presumption that the baby's injuries would not ordinarily be sustained except as a result of their unreasonable or neglectful acts. (§ 355.1, subds. (a) & (c).) The problem, however, is that the testimony of Drs. Holick and Pals concerning the cause of the baby's injuries would likely have been inadmissible due to parents' failure to petition under section 827 for release of the baby's records to these experts and obtain the consent of minor's counsel.

Section 827 restricts access to the case file in a juvenile proceeding by identifying those entitled to inspect the file without a court order, and a smaller number of persons who are also entitled to receive copies of the file without a court order. (§ 827, subd. (a)(1), (5); rule 5.552(b)(1).) Section 827 does not authorize a parent or the parent's attorney to provide copies of a juvenile case file to an expert witness without court order. (See, e.g., *Cimarusti v. Superior Court*, *supra*, 79 Cal.App.4th at pp. 803–804; *In re Tiffany G.*, *supra*, 29 Cal.App.4th at pp. 449–450.) A child's confidential medical records are also protected by the physician-patient privilege, which may be invoked by the child's counsel, who holds the privilege if the child is not of sufficient age and maturity to consent. (§ 317, subd. (f).)

The record reveals that Drs. Holick and Pals were provided the baby's medical information and documentation without a court order and without the consent of minor's counsel, who holds the physician-patient privilege for the baby. As the juvenile court noted, even if it allowed these doctors to appear remotely or appointed them as experts, a section 827 petition allowing dissemination of the juvenile case file had not been approved and the baby's information could not be used without minor's counsel's

25.

permission. Given this, the juvenile court likely would have restricted the doctors' testimony or even disallowed it altogether.

Consequently, the failure to appoint these doctors as experts or to allow them to testify remotely could not be prejudicial to parents, as their opinions based on the baby's medical records were inadmissible. We note the parents' attorneys were made aware in December 2022 of the need to comply with section 827 before disseminating documents in the juvenile case file to their experts. Despite this, their attorneys never filed a section 827 petition. If they had, a hearing could have been held which would have addressed the issues of dissemination of the juvenile case file and minor's counsel's invocation of the physician-patient privilege.

## III. Motion to Relieve Minor's Counsel

Father and mother contend the juvenile court erred in denying father's motion to relieve minor's counsel. They assert minor's counsel did not advocate for the baby's best interest and instead "stonewalled allowing competent, substantial evidence into this case by failing to allow medical records into evidence." They claim minor's counsel erroneously declared the baby holds the medical privilege and failed to conduct an independent investigation into the petition's allegations or determine the strength of the department's evidence. Instead, parents argue, minor's counsel unilaterally blocked their right to present rebuttal evidence.

### A. *Legal Principles and Standard of Review*

A juvenile court must appoint counsel for a child "unless the court finds that the child … would not benefit from the appointment of counsel." (§ 317, subd. (c)(1).) In California, "counsel for minors routinely serve in a dual role, as both the child's legal counsel and the child's [CAPTA] guardian ad litem." (*In re Kristen B.* (2008)

163 Cal.App.4th 1535, 1541–1542; §§ 317, 326.5; rules 5.660, 5.662.)[10] The general duties and responsibilities of a CAPTA guardian ad litem are to obtain firsthand a clear understanding of the situation and needs of the child and to make recommendations to the court concerning the child's best interest as appropriate. (Rule 5.662(d).)

An attorney appointed to represent the child has a legal and ethical obligation to represent the child's interests. (*In re Josiah Z.* (2005) 36 Cal.4th 664, 675–677; *In re Alexandria P.* (2016) 1 Cal.App.5th 331, 358.) A "primary responsibility" of minor's counsel is to "advocate for the protection, safety, and physical and emotional well-being of the child." (§ 317, subd. (c).) "An attorney appointed as a CAPTA guardian ad litem 'advocates for the protection and safety of the child, investigates, participates in presenting evidence to the court, advises the court of the child's wishes, and investigates interests of the child beyond the dependency. (§ 317, subds. (c), (e).) These functions are both more and less than a traditional guardian ad litem in an adversarial proceeding, but are precisely those necessary to provide an independent voice for the child.' " (*In re Nicole H.* (2011) 201 Cal.App.4th 388, 398.)

Once appointed, minor's counsel continues to represent the child "unless relieved by the court upon the substitution of other counsel or for cause." (§ 317, subd. (d).) We review a juvenile court's decision on whether to relieve counsel pursuant to section 317, subdivision (d) for an abuse of discretion. (*In re Jesse C.* (1999) 71 Cal.App.4th 1481, 1491.)

### B.  Analysis

Here, parents attempted to remove minor's counsel for cause. The gravamen of their argument is that minor's counsel was not acting in the baby's best interest because he refused to waive the physician-patient privilege, thereby obstructing their ability to

---

[10]  CAPTA stands for the federal Child Abuse Prevention and Treatment Act (42 U.S.C. § 5101 et seq.). (See § 326.5; Rule 5.662(c).)

rebut the department's evidence. Essentially, they contend the baby's best interest could only be served by advocating for their position, namely, that they did not harm the baby which could be proved through the testimony of Drs. Holick and Pals.

Minor's counsel, however, had the right to invoke the physician-patient privilege under section 317, subdivision (f). In doing so, minor's counsel believed he was acting in the baby's best interest. When minor's counsel asserted the privilege, he explained he was concerned that, while mother reached out to these doctors in January 2023, the parents did not speak with their attorney about it or work with minor's counsel. Instead, the doctors were provided the baby's confidential medical records. Minor's counsel was concerned that mother found Dr. Holick through a Facebook group of mothers in her similar situation and reached out to him rather than "garnering a general second opinion from a different doctor."

Minor's counsel did not believe these doctors were serving the baby's best interest, as they only testify on behalf of parents in "broken baby cases." Minor's counsel stated he investigated these doctors, and, in his opinion, it was not in the baby's best interest to have them testify about the cause of the baby's injuries. In denying the motion, the juvenile court essentially found that minor's counsel was complying with his legal obligation to represent the baby's interests.

There was no abuse of discretion. Minor's counsel did not assert the privilege haphazardly, but rather investigated the experts the parents intended to call and determined it was not in the baby's best interest to waive the privilege. We recognize parents are claiming the baby's best interests are served by allowing Drs. Holick and Pals to testify, but their argument is undermined by the fact that minor's counsel argued just the opposite. There is nothing to suggest minor's counsel was acting in bad faith in so arguing or failed in his obligations to investigate and advocate for the baby's protection and safety.

Moreover, parents have not demonstrated they suffered prejudice from the juvenile court's refusal to remove minor's counsel.  This is because even if minor's counsel had waived the privilege and removed all objections to the testimony of parents' experts, their testimony likely still would have been excluded because county counsel objected both to the experts testifying remotely and the provision of the baby's juvenile case file records to the experts without complying with section 827.

## DISPOSITION

The petitions for an extraordinary writ and requests for a stay are denied.  This court's opinion is final forthwith as to this court pursuant to rule 8.490(b)(2)(A).